**Nos. 22-1358**

**In the United States Court of Appeals
For the Tenth Circuit**

———————

BRYCE WATKINS,

*Plaintiff-Appellant,*

v.

BRIAN WUNDERLICH, KEVIN NICHOLS, TAMMY BLACK,

*Defendants-Appellees.*

———————

**On Appeal from the United States District Court for the District of Colorado**
Civil Action No. 1:20-cv-01172-RM-MEH
The Honorable Judge Raymond Moore

———————

**PLAINTIFF-APPELLANT'S OPENING BRIEF**
———————
DAVID A. LANE
MICHAEL P. FAIRHURST
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001 fax

*Attorneys for Plaintiff-Appellant*

**ORAL ARGUMENT IS REQUESTED**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iv

**1. S**TATEMENT **R**EGARDING **P**RIOR OR **R**ELATED **A**PPEALS ....................1

**2. J**URISDICTIONAL **S**TATEMENT .................................................1

3. I**SSUES **P**RESENTED ................................................................1

**4. S**TATEMENT OF THE **C**ASE .........................................................2

     **I.**    **Factual Background** ............................................................2

          Appellant expressly communicates to the Appellees that they cannot enter his home ..........................................2

          Appellees Nichols and Black Enter Mr. Watkins' Home Through the Garage, Supervisor Wunderlich Watches His Subordinates Invade Mr. Watkins' Home but Does Nothing to Stop Them. Wunderlich Instead Enters the Garage Himself ......................................................................7

          Appellees Wunderlich, Nichols, and Black Storm into the Living Area of Mr. Watkins' Home Despite Knowing Mr. Watkins Had Unequivocally Refused to Consent to the Entry, and Despite Lacking a Search Warrant or an Exigency ......................................................................9

          Appellees Wunderlich, Nichols, and Black Beat and Terrorized Mr. Watkins Without Justification Inside His Own Home ......................................................................10

          Additional material facts ......................................................15

     II.    **Procedural Background** ...................................................22

**5. S**UMMARY OF THE **A**RGUMENT .................................................23

**6. S**TANDARD OF **R**EVIEW ...........................................................25

**7. A**RGUMENT ...............................................................................26

I.      **Appellees Nichols and Black illegally entered Appellant Watkins' home**..............................................................26

      A.      ***Randolph* applies to all circumstances when the expressly objecting occupant is physically present in their home, as Mr. Watkins was here**...........................................32

      B.      **There is no *per se* domestic violence exception to the Fourth Amendment**...........................................................37

      C.      **Neither Nichols nor Black can receive qualified immunity from Plaintiff's unlawful entry/search claim**.....................40

II      **Appellees Nichols and Black and Wunderlich subjected Appellant Watkins to excessive force inside his home**.....................43

      A.      **No Appellee can receive qualified immunity from Mr. Watkins' excessive force claim**..............................49

**CONCLUSION**.........................................................................52

**STATEMENT REGARDING ORAL ARGUMENT**..........................53

**CERTIFICATE OF COMPLIANCE**...............................................54

**CERTIFICATE OF SERVICE**.......................................................55

**ECF 89 DISTRICT COURT ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** .......................................... ADDENDUM

**ECF 90 FINAL JUDGMENT** .................................................. ADDENDUM

# TABLE OF AUTHORITIES

**Cases**                                                        **Page**

*Allen v. Muskogee, Okl.*,
119 F.3d 837 (10th Cir. 1997) ...........................................................45

*Becker v. Bateman*,
709 F.3d 1019 (10th Cir. 2013) .........................................................50

*Bonivert v. City of Clarkston*,
883 F.3d 865 (9th Cir. 2018) ..............................................34, 41, 42

*Bouchard v. Whetstone*,
772 F. Supp. 2d 1352 (D. Colo. 2011)...............................................45

*Caniglia v. Strom*,
141 S. Ct. 1596 (2021)........................................................................33

*Casey v. City of Federal Heights*,
509 F.3d 1278 (10th Cir. 2007) ...................................................49, 50

*Cavanaugh v. Woods Cross City*,
625 F.3d 661 (10th Cir. 2010) ...........................................................49

*Chivers v. Reaves*, No. 1:13-cv-00171
2017 U.S. Dist. LEXIS 159397 (D. Utah Sep. 26, 2017)...................28

*Cook v. Peters*,
604 F. App'x 663 (10th Cir. 2015) .....................................................50

*Cortez v. McCauley*,
478 F.3d 1108 (10th Cir. 2007) .........................................................51

*Cummings v. City of Akron*,
418 F.3d 676 (6th Cir. 2005) .......................................................42, 49

*Dagdagan v. Wentz*,
428 F. App'x 683 (9th Cir. 2011) .......................................................38

*Dixon v. Richer*,
  922 F.2d 1456 (10th Cir. 1991) .......................................................................49

*Fernandez v. California*,
  571 U.S. 292 (2014).................................................................................35, 37

*Fisher v. City of Las Cruces*,
  584 F.3d 888 (10th Cir. 2009) ..................................................................47, 48

*Georgia v. Randolph*,
  547 U.S. 103 (2006)........................................... 23, 24, 27, 29, 32, 34, 35, 36, 40

*Graham v. Connor*,
  490 U.S. 386 (1989)........................................................................................44

*Grass v. Johnson*,
  322 F. App'x 596 (10th Cir. 2009) .................................................................48

*Illinois v. Rodriguez*,
  497 U.S. 177 (1990)........................................................................................30

*Kentucky v. King*,
  131 S. Ct. 1849 (2011)....................................................................................30

*Kyllo v. United States*,
  533 U.S. 27 (2001)..........................................................................................27

*L.A. County v. Rettele*,
  550 U.S. 609 (2007)..................................................................................44, 51

*Lange v. California*,
  141 S. Ct. 2011 (2021)....................................................................................33

*Long v. Fulmer*,
  545 F. App'x 757 (10th Cir. 2013) .................................................................50

*Lynch v. Bd. of Cty. Comm'rs*,
  786 F. App'x 774 (10th Cir. 2019) .................................................................51

*Manzanares v. Higdon*,
  575 F.3d 1135 (10th Cir. 2009) ....................................................32, 34

*McCoy v. Meyers*,
  887 F.3d 1034 (10th Cir. 2018) .........................................................49

*McInerney v. King*,
  791 F.3d 1224 (10th Cir. 2015) .........................................................35

*Medina v. Cram*,
  252 F.3d 1124 (10th Cir. 2001) .........................................................45

*Morris v. Noe*,
  672 F.3d 1185 (10th Cir. 2012) .........................................................50

*Olsen v. Layton Hills Mall*,
  312 F.3d 1304 (10th Cir. 2002) .........................................................26

*Painter v. Robertson*,
  185 F.3d 557 (6th Cir. 1999) ............................................................32

*Payton v. New York*,
  445 U.S. 573 (1980)....................................................................27, 33

*Rouzan v. Thomas*, No. CV 12-10352-BRO JPR,
  2014 U.S. Dist. LEXIS 80348 (C.D. Cal. Apr. 21, 2014)..................38

*Rozycki v. City of Champlin*, No. 15–589 (JRT/FLN),
  2016 WL 7493619 (D. Minn. Dec. 30, 2016) ...................................44

*Storey v. Taylor*,
  696 F.3d 987 (10th Cir. 2012) ..........................................................38

*Taylor v. United States*,
  286 U.S. 1 (1932)..............................................................................43

*United States v. Aquino*,
  836 F.2d 1268 (10th Cir. 1988) ........................................................27

*United States v. Davis*, No. 01-40036-01- RDR,
   2001 U.S. Dist. LEXIS 13713 (D. Kan. Aug. 7, 2001) .........................38, 39, 40

*United States v. Dunn*,
   480 U.S. 294 (1987)...............................................................................42, 43

*United States v. Espinoza*,
   403 F. App'x 239 (9th Cir. 2010) .......................................................38

*United States v. Johnson*,
   656 F.3d 375 (6th Cir. 2011) .............................................................37

*United States v. Jones*,
   701 F.3d 1300 (10th Cir. 2012) .........................................................42

*United States v. Lopez*, No. 2:08-CR-94,
   2009 U.S. Dist. LEXIS 30941 (E.D. Tenn. Apr. 13, 2009)................38

*United States v. McRae*,
   81 F.3d 1528 (10th Cir. 1996) .....................................................28, 42

*United States v. Montoya*, No. 15-cr-4080 WJ,
   2016 U.S. Dist. LEXIS 152828 (D.N.M. Nov. 2, 2016) ....................35

*United States v. Neadeau*, No. 17-cr-173 (SRN/LIB),
   2017 U.S. Dist. LEXIS 214515 (D. Minn. Nov. 6, 2017)..................38

*United States v. Oaxaca*,
   233 F.3d 1154 (9th Cir. 2000) ...........................................................43

*United States v. Santana*,
   427 U.S. 38 (1976)............................................................................45

*United States v. Tatman*,
   397 F. App'x 152 (6th Cir. 2010).......................................................36

*United States v. Williams*,
   521 F.3d 902 (8th Cir. 2008) .............................................................42

*Vinson v. Vermilion Cty.*,
    776 F.3d 924 (7th Cir. 2015) ................................................................42

*Walton v. Gomez (In re Estate of Booker)*,
    745 F.3d 405 (10th Cir. 2014) ................................................26, 51, 52

*Weigel v. Broad*,
    544 F.3d 1143 (10th Cir. 2008) ........................................................44

*Woodman v. Runyon*,
    132 F.3d 1330 (10th Cir. 1997) ..................................................25, 26

## **STATUTES**

28 U.S.C. §1291 ....................................................................................1

42 U.S.C. §1331 ....................................................................................1

42 U.S.C. § 1983 ..................................................................................22

1. **STATEMENT REGARDING PRIOR OR RELATED APPEALS**

There are no prior or related appeals.

2. **JURISDICTIONAL STATEMENT**

The District Court had jurisdiction over Plaintiff-Appellant's federal civil rights claims pursuant to 28 U.S.C. § 1331. Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1291, as this is an appeal from a final decision of the District Court. The District Court entered an order granting Defendants/Appellees' Motion for Summary Judgment on September 22, 2022. The District Court's order dismissed all of the Plaintiff/Appellant's claims against all the Defendants/Appellees. Final judgment was entered on September 22, 2022. Appellant timely filed his Notice of Appeal on October 20, 2022. This Opening Brief is timely filed pursuant to the deadlines imposed by the Court upon granting Appellant's motion for extension of time to file his opening brief.

3. **ISSUES PRESENTED**

I.      Whether the District Court erred in dismissing Appellant's unlawful entry/search claim under the Fourth Amendment against Appellees Nichols and Black, when Nichols and Black entered Appellant's home without a search warrant or an exigent circumstance, and Nichols and Black knew Appellant was alone inside and had expressly communicated to the police that they could not enter his home.

II.     Whether the District Court erred in dismissing Appellant's excessive force claim under the Fourth Amendment against Appellees Nichols, Black, and Wunderlich when Appellees, acting in concert, repeatedly threw Appellant to the ground, choked Appellant, placed crushing bodyweight on Appellant's back, intentionally excessively tightly handcuffed Appellant's wrists together, and then deliberately kept Appellant in excessively tight handcuffs for an extended period of time, thereby inflicting significant physical and other injuries on Appellant, despite Appellant having engaged in minimal or no resistance.

**4.  <u>S</u><u>TATEMENT OF THE</u> <u>C</u><u>ASE</u>**

**I.     <u>Factual Background</u>**

**<u>Appellant expressly communicates to the Appellees that they cannot enter his home.</u>**

On the evening of April 28, 2018, Appellant Bryce Watkins' wife at the time filed a police report with the Douglas County, Colorado sheriff's office alleging that she and Mr. Watkins had been involved in a domestic violence incident on the morning of April 28. Aplt.App.-2-80 Audio 911 Call, at 0:00-1:11 in the recording, 1:51-4:15 in the recording. The police were unable to contact Mr. Watkins on April 28. Aplt.App.-2-257.

About 24 hours after the reported altercation between Mr. and Ms. Watkins, Ms. Watkins called 911 and stated that Mr. Watkins had recently arrived home. Aplt.App.-2-93. Soon afterwards, Deputy Kevin Nichols, Deputy Tammy Black,

and Sergeant Brian Wunderlich ("Appellees") of the Douglas County Sheriff's Office were dispatched to the Watkins' residence in Parker, CO to follow up on the April 28 domestic violence report. They arrived in separate patrol vehicles at about 930am on April 29. Ms. Watkins was safely standing outside in a park near Mr. Watkins' home when Nichols arrived on scene. Aplt.App.-2-93.

Deputy Nichols and Ms. Watkins spoke while they were in the park together. Ms. Watkins identified Mr. Watkins' home and told Nichols that she and Mr. Watkins live there together. Ms. Watkins also told Nichols that there were not any firearms in the home. Aplt.App.-2-83, Nichols BWC at 15:47:53-15:48:09.

During Nichols' conversation with Ms. Watkins in the park, Mr. Watkins called her phone, and Nichols answered it. Aplt.App.-2-83, Nichols BWC at 15:51:35-15:52:14. Nichols asked Mr. Watkins to come out of the house to speak with deputies. Mr. Watkins refused. Mr. Watkins instead clearly asserted to Nichols that law enforcement **could not** enter his home. Aplt.App.-2-83, Nichols BWC at 15:51:43-15:52:14; Aplt.App.-2-252-53.[1]

---

[1] While Nichols denied that Plaintiff said this to him during his deposition in this case, even Nichols previously admitted that Plaintiff explicitly stated to him that the police could not enter his home before any Appellee entered his home. For instance, Nichols told Deputy Black that Plaintiff had explicitly told him on the phone that the police could not enter his home. Aplt.App.-2-260, Black Internal Affairs (IA) interview at 13:56:15 to 13:56:49; Aplt.App.-2-228.

Nichols reported on his police radio (which at least Appellees Black and Wunderlich could hear at the time) that he just talked with Mr. Watkins, that Mr. Watkins was refusing to come to the door, that Mr. Watkins stated he was going to take a shower, and that Mr. Watkins hung up on him (Nichols). Aplt.App.-2-83, Nichols BWC at 15:52:25-15:52:31.Thus, it was apparent to all the Appellees – before any Appellee entered Mr. Watkins' home – that Mr. Watkins unequivocally **did not consent** to law enforcement entering his home.[2]

Immediately after the call with Mr. Watkins, Nichols told Ms. Watkins that sheriffs were going to have to enter Mr. Watkins' home because he was refusing to come outside. Aplt.App.-2-201; Aplt.App.-2-241. Likewise, when Nichols reported to Black and Wunderlich over the radio that Mr. Watkins refused to speak with law enforcement and stated that he was about to get into the shower, Wunderlich told Nichols to tell Mr. Watkins to not get into the shower and to tell him we're going to come in. Aplt.App.-2-236. Sergeant Wunderlich was the supervisor on scene at the time. Aplt.App.-2-234. Thus, simply because Mr. Watkins refused to come out of his home to talk with the police, Appellees decided to go into his home to arrest him. Aplt.App.-2-237; Aplt.App.-2-198 ("Q: So the --

---

[2] Even Appellees have admitted that, if Mr. Watkins told Nichols on the phone that the police could not come into his house, then the police would not have had legal authority to enter his home. Aplt.App.-2-219; Aplt.App.-2-235.

really, the whole reason for going into Bryce Watkins' home was to arrest him, right? / A: Correct. / Q: Any other reason? / A: No.").

Before leaving the park, Nichols also asked Ms. Watkins if there was a garage code, and she stated that there was and gave him the code. Ms. Watkins told Nichols that this same code would open the front door. Ap Aplt.App.-2-83, Nichols BWC at 15:52:18-15:52:21 & 15:52:32-15:52:46 & 15:53:09-15:53:17. However, Nichols did not ask Ms. Watkins if the police had permission to enter Mr. Watkins' home, nor did Ms. Watkins state that the police had permission to enter Mr. Watkins' home. Aplt.App.-2-83, Nichols BWC at 15:46:30-15:54:15.

Once Nichols ended his conversation with Ms. Watkins, he reentered his patrol vehicle and drove the short distance to Mr. Watkins' house. He reported on the radio to his Co-Appellees that he was heading to Mr. Watkins' home, and that Ms. Watkins was going to remain in the park. Appellees Black and Wunderlich were standing just outside Mr. Watkins' house when Nichols arrived there. Aplt.App.-2-83, Nichols BWC at 15:54:13-15:55:17.

Nichols relayed the garage code Ms. Watkins provided to Black and Wunderlich. Aplt.App.-2-85, Black BWC at 15:53:20-35. Wunderlich tried to open the garage door using the code Ms. Watkins provided but was unable to do so. Aplt.App.-2-85, Black BWC at 15:54:20-15:54:45.

Nichols went onto the front porch of Mr. Watkins home. Black was already standing on the front porch near the front door. Aplt.App.-2-85, Black BWC at 15:55-25-30. Soon after Nichols joined Black on the front porch, both he and Black intentionally muted their bodycams. Aplt.App.-2-83, Nichols BWC at 15:55:32; Aplt.App.-2-2-85, Black BWC at 15:55:30. For the next minute or so, Nichols and Black conversed, but what exactly they said is unknown as both of these Appellees deliberately covered it up, and Wunderlich was too far away from the conversation of Nichols and Black to fully capture it on his own body camera recording. Aplt.App.-2-83, Nichols BWC at 15:55:30-56:30; Aplt.App.-2-86, Wunderlich BWC at 15:55:30-56:30.

When the audio resumed on Nichol's body cam footage, he stated something to the effect of "I didn't ask for that to be honest with you." Nichols said this in response to Wunderlich asking him whether Ms. Watkins explicitly gave law enforcement permission to enter the home. Aplt.App.-2-83, Nichols BWC at 15:56:30. Black was standing right next to Nichols at the time. Therefore, all the Appellees knew that even Ms. Watkins had not given the police explicit permission to enter Mr. Watkins' home before any Appellee entered Mr. Watkins' home.

Nichols then attempted to unlock the front door using the code that Ms. Watkins had given him, but it did not unlock the door, and he told Black that it was not working. In response, Black stated that they should enter the home with their

less lethal weapons (i.e., tasers) drawn. Black and Nichols also discussed the

possibility that Mr. Watkins may have changed the door code. Aplt.App.-2-83,

Nichols BWC at 15:56-35-47.

Wunderlich meanwhile stood outside Mr. Watkins' garage. Appellees Black

and Nichols left the front porch walked over to Wunderlich. Aplt.App.-2-83,

Nichols BWC at 15:57:20-30. Nichols entered the code Ms. Watkins had given

him into the garage door keypad. It worked – and the garage door opened. The

garage manifestly was part of Mr. Watkins' home; it was fully encompassed and

enclosed by the walls and roof of Mr. Watkins' house, and there were two cars and

numerous other personal effects inside. The garage was not semi-detached or

detached from the house. Aplt.App.-2-83, Nichols BWC at 15:57:33-15:57:50.

### **Appellees Nichols and Black Enter Mr. Watkins' Home Through the Garage. Supervisor Wunderlich Watches His Subordinates Invade Mr. Watkins' Home but Does Nothing to Stop Them. Wunderlich Instead Enters the Garage Himself.**

Appellees Nichols and Black entered Mr. Watkins' garage that was part of

their interior of his home. Aplt.App.-2-83, Nichols BWC at 15:57:48-15:58:15.

Wunderlich watched this home invasion unfold but failed to immediately stop it,

despite having the opportunity to do so. *Id*.

As Appellees Nichols and Black prepared (with weapons drawn) to open the

door into the next room in Mr. Watkins house, Wunderlich asked if Ms. Watkins

had given them permission to go inside. Nichols again told Wunderlich that she

had not explicitly given law enforcement permission to enter the home (he had said the same thing to Black and Wunderlich earlier when he was standing on the front porch). Aplt.App.-2-83, Nichols BWC at 15:58:10-15. **Nichols conceded that the Appellees illegally entered Mr. Watkins' home before Ms. Watkins explicitly consented to the home entry, and that he knew the entry was illegal during the events underlying Mr. Watkins' case.** Aplt.App.-2-196; Aplt.App.-2-239.

Nichols then went back outside by passing underneath the open garage door, in order to speak with Ms. Watkins again. Aplt.App.-2-83, Nichols BWC at 15:58:15-20; 16:00:30-45. Meanwhile, Black remained inside the garage. Even after Nichols told Black that Ms. Watkins had not explicitly given the police permission to enter Mr. Watkins' home, she chose to remain in Mr. Watkins' home. Aplt.App.-2-223. For his part, Wunderlich did not say or do anything to stop Black from continuing to occupy Mr. Watkins' home. Aplt.App.-2-83, Nichols BWC at 15:58:15-16:00:30; Aplt.App.-2-86, Wunderlich BWC at 15:58:50-16:06-30. Wunderlich instead crossed the threshold between the garage and exterior into Mr. Watkins' home himself. Aplt.App.-2-239.

Before Nichols left the premises to return to the nearby park, Wunderlich told Nichols to place a trash can next to the garage door sensor so that it would stay open. Nichols dragged over a trash can to hold open the garage door to Mr. Watkins' house. Aplt.App.-2-83, Nichols BWC at 15:59:25-35

8

Nichols then walked back to the park to ask Ms. Watkins if she would consent to the deputies' entry to the home. She said that she did. She also explicitly stated that she and Mr. Watkins both owned the home. Aplt.App.-2-83, Nichols BWC at 16:00:30-45. After Nichols returned to the garage, he reported that Ms. Watkins had given them permission to enter the home. He said nothing about Mr. Watkins consenting. Aplt.App.-2-83 , Nichols BWC at 16:04:254-16:06:30. Of course, Nichols still knew that Mr. Watkins had explicitly refused to consent to the police entering his home just a few minutes earlier. So did Appellees Black and Wunderlich. Aplt.App.-2-83, Nichols BWC at 15:52:25-15:52:31.

### **Appellees Wunderlich, Nichols, and Black Storm into the Living Area of Mr. Watkins' Home Despite Knowing Mr. Watkins Had Unequivocally Refused to Consent to the Entry, and Despite Lacking a Search Warrant or an Exigency.**

Nichols again entered Mr. Watkins' home via the garage and joined Black, who had already been lurking in there for a while. Nichols then led the charge into the living area of Mr. Watkins' home. He opened the closed door separating the garage and laundry room and went into the laundry room. Black followed close behind him. Aplt.App.-2-83, Nichols BWC at 16:06:314-16:06:50.

Black and Nichols then went through Mr. Watkins' kitchen area to a staircase that led to the second floor. Once they were inside Mr. Watkins' home, Appellees Nichols and Black started loudly announcing that the sheriff's office was there and demanding that Watkins immediately come out and talk with them.

Aplt.App.-2-85, Black BWC at 16:06:39-16:07:18. Wunderlich entered Mr.

Watkins' home through the front door around the time that Nichols and Black

arrived at the base of the staircase. Aplt.App.-2-86, Wunderlich BWC at 16:07:03-

16:07:35.

Mr. Watkins was upstairs applying lotion to his face at the time, having

recently exited the shower. Aplt.App.-2-254. Upon hearing the loud commands of

unexpected home intruders, Mr. Watkins came partway down the stairs. Aplt.App.-

2-85, Black BWC at 16:07:22-16:07:31.

Mr. Watkins was surprised, terrified, and bewildered – and repeatedly asked

what was going on. No one answered this reasonable query. Mr. Watkins also

clearly was unarmed and nonthreatening – wearing only a towel around his waist at

the time. Nichols BWC at 16:07:30-16:08; Aplt.App.-2-85, Black BWC at

16:07:30-16:08; Aplt.App.-2-83.

### **Appellees Wunderlich, Nichols, and Black Beat and Terrorized Mr. Watkins Without Justification Inside His Own Home.**

Nichols and Black then proceeded to point their weapons straight at Mr.

Watkins, which further compounded his terror. Aplt.App.-2-85, Black BWC at

16:07:50-16:08. In the ensuing moments, Mr. Watkins again plainly

communicated that the police did not have permission to be in his home by loudly

and clearly stating, *inter alia*:

- "Excuse me, you're in my house!"

- "You're in my house!"

- "This is 50% my house! my name is on the title!"

Additionally, when Nichols said that "your wife gave us permission" to be in the home, Mr. Watkins immediately exclaimed "**<u>NO!</u>**". Aplt.App.-2-85, Black BWC at 18:42-20:10; Aplt.App.-2-209.[3]

However, none of this deterred any of the Appellees from continuing to occupy Mr. Watkins' home – with their weapons trained on him. Soon after Mr. Watkins first saw the Appellees, he complied with their commands for him to come down the stairs and descended to the base of his staircase. He kept asking the Appellees for an explanation about what was going on. They again failed to provide one and thereby needlessly escalated the situation. Aplt.App.-2-206; Aplt.App.-2-85, Black BWC at 18:51-19:32.

After Mr. Watkins stopped on the bottom stair, Deputy Nichols tried to grab one of Mr. Watkins' arms, and he reflexively pulled his arms away and began to back up the stairs. Aplt.App.-2-85, Black BWC at 16:08:10-16:08:14; Aplt.App.-

---

[3] Mr. Watkins was obviously shocked to see the police in his home even though he had expressly refused to give the police permission to enter his home. Plaintiff did not even more vociferously tell the Appellees to leave his home when he initially encountered them in his home because the Appellees subjected Plaintiff to intense duress by, among other things, pointing multiple weapons (including a deadly weapon) right at him while refusing to explain what they were doing in his house. Appellees intentionally and/or recklessly escalated the situation by refusing to answer Plaintiff's reasonable queries about why the police had invaded his home.

2-86, Wunderlich BWC at 16:08:11-16:08:15. However, Mr. Watkins did nothing that was threatening at the time. Mr. Watkins also did nothing indicating that he was attempting to flee his home. Mr. Watkins clearly was just confused, stunned, and fearful for his life. Aplt.App.-2-85, Black BWC at 18:51-19:32; Aplt.App.-2-202; Aplt.App.-2-224; Aplt.App.-2-263.

Yet, almost instantaneously after Mr. Watkins took just a few steps backwards, Deputy Nichols grabbed and tackled him, throwing Mr. Watkins down hard to the ground with his back pointed towards the stairs. At about the same time, Nichols clenched Mr. Watkins' neck with one of his hands and began to intentionally choke him. Aplt.App.-2-263; Aplt.App.-2-85, Black BWC at 16:08:24-16:08:39; Aplt.App.-2-207 (Nichols admitting he put hand on Mr. Watkins' neck).

Nichols told Mr. Watkins in rote fashion not to resist, although even Wunderlich admitted Mr. Watkins was not resisting while Nichols and Mr. Watkins were on the middle landing. Indeed, at no point during Mr. Watkins' interaction with Appellees did he kick, punch, or spit on anyone, nor did Mr. Watkins threaten to harm law enforcement in any way, nor did Mr. Watkins even say he would not peacefully submit to being arrested. Aplt.App.-2-85, Black BWC at 16:08:13-16:08:21; Aplt.App.-2-86, Wunderlich BWC at 16:08:13-16:08:23; Aplt.App.-2-208 (Nichols admitting that he was "trained that when . . . using

12

physical force on a suspect . . . . should say something like, Stop resisting");

Aplt.App.-2-244 (Mr. Watkins' only so-called "resistance" merely retreating up

the stairs).

Mr. Watkins was by this point petrified and confused beyond belief. Law

enforcement had entered the sanctity of his home (repeatedly), pointed weapons at

him for no reason, and attacked him, including a large male deputy tackling and

choking him. Consequently, Mr. Watkins instinctively tried to retreat further up the

stairs. Aplt.App.-2-86, Wunderlich BWC at 16:08:20-16:08:27.

Nichols, Wunderlich, and Black, acting in concert, immediately chased Mr.

Watkins up the stairs and Wunderlich deliberately slammed him down very hard to

the ground, face first, while he was still on the stairs. Aplt.App.-2-244-45

(admitting he intentionally tackled Mr. Watkins); Aplt.App.-2-210; Aplt.App.-2-

263 .This caused serious additional pain to Mr. Watkins. Mr. Watkins further

suffered the profound indignity of his towel falling off his body during this time.

Aplt.App.-2-85, Black BWC at 16:08:25-55. He was now completely naked.

Appellees Nichols, Wunderlich, and Black, acting in concert, continued to

brutalize Mr. Watkins once he was on the ground (and naked). For example, After

Wunderlich slammed Mr. Watkins to the ground on his stairs, Wunderlich

admitted to crushing Mr. Watkins under his approximately 255 pounds of body

weight, even though Mr. Watkins was not resisting at the time. Aplt.App.-2-242

(Wunderlich admitting Watkins complied with commands once he went hands on with him); Aplt.App.-2-86, Wunderlich BWC at 16:08:25-16:09:15. Nichols placed a taser in his back and threatened to deploy it if he did not stop resisting (though Mr. Watkins was clearly not resisting at the time). Aplt.App.-2-86, Wunderlich BWC at 16:08:25-16:09:15. Even Wunderlich admitted that Nichols was unjustified in threatening to taser Mr. Watkins after Mr. Watkins was handcuffed and fully restrained. Aplt.App.-2-243

Nichols then intentionally excessively tightly handcuffed Mr. Watkins hands behind his back, while he was still lying naked on the staircase. This caused significant additional pain to Mr. Watkins' wrists. Aplt.App.-2-263; Aplt.App.-2-255-56; Aplt.App.-2-210

At no relevant time did any Appellee try to intervene to stop their co-Appellees from subjecting Mr. Watkins to excessive force, despite having the opportunity to do so. Aplt.App.-2-184. Further, Nichols' body worn camera (BWC) conveniently (for him) turned off when he was subjecting Mr. Watkins to excessive force. This is the only time the camera allegedly inadvertently stopped working during the entire time he was on scene. Aplt.App.-2-195.

Eventually, Wunderlich retrieved clothes for Mr. Watkins and Nichols put pants on him. Aplt.App.-2-86, Wunderlich BWC at 16:09:24-16:09:34. The Appellees then escorted Mr. Watkins, still shirtless and shoeless, to an awaiting

patrol car in front of his on-looking neighbors and his prospective work clients. Aplt.App.-2-84, Nichols BWC at 16:12:14-16:14:02.

Mr. Watkins was then transported to the DCSO jail. Aplt.App.-2-129-32. As mentioned, the Appellees intentionally placed Mr. Watkins in excessively tight handcuffs. They then kept him excessively tightly cuffed for an extended period. Of particular note, while Mr. Watkins was waiting to be booked as Black typed the police report, he asked her repeatedly if someone could loosen his handcuffs because, as he explained, he was starting to lose feeling in his hands. Black intentionally took no action to ameliorate his reported pain and loss of circulation for over an hour. Aplt.App.-2-263; Aplt.App.-2-255; Aplt.App.-2-210. Mr. Watkins suffered visibly bruised wrists and other injuries from this excessive force. Aplt.App.-2-105-06

### **Additional material facts**

Additional facts relevant to demonstrating the Appellees' liability follow.

- No law enforcement officer attempted to obtain an arrest (or search) warrant for Mr. Watkins' home on April 28 or April 29 despite having ample time to request one. Aplt.App.-2-197. Thus, Appellees entered Mr. Watkins' home without a warrant. Nichols admitted that there would not have been legal justification for a search warrant for Mr. Watkins' home. Aplt.App.-2-198

15

- Through their communications with Nichols, and their own independent knowledge of the April 28 report of Ms. Watkins, no Appellee was aware of any facts indicating that an exigency existed inside Mr. Watkins' home on the morning of April 29. Aplt.App.-2-215

- Appellees were unaware of Mr. Watkins' criminal history (or lack thereof) when initiating contact with him. Aplt.App.-2-200.

- Appellees had no particular reason to believe Mr. Watkins posed a threat to himself or others when he was in his house. Aplt.App.-2-200

- Before Appellees initiated contact with Mr. Watkins, they knew he was in his house alone. Aplt.App.-2-200

- Before entering Mr. Watkins' home, Appellees did not observe anything noteworthy from inside the home. Aplt.App.-2-221

- Douglas County found that Appellees wrongly failed to obtain Ms. Watkins' explicit consent to enter Mr. Watkins' home before they invaded Mr. Watkins' home. Aplt.App.-3-146-9.

- A reasonable jury could find that the Appellees all lack credibility, and therefore disbelieve their testimony regarding some or even all of the material issues about which factual disputes exist. Because credibility is a central issue in the case, that reinforces the conclusion that this case is one for the jury to decide. For example, Black stated to Douglas County Internal

Affairs that Nichols told her that Mr. Watkins had explicitly told him on the phone that the police could not enter his home. But then Black testified during her deposition in this case that Nichols had said nothing like that to her, ever. Both things cannot be true. Aplt.App.-2-252-53; Aplt.App.-2-260 Black IA interview 13:56:15 to 13:56:49; Aplt.App.-2-218, Aplt.App.-2-228.

- Addressing her completely changed story, Black testified: "[a]t the time I did my IA interview I had no idea that I was in a lawsuit." As such, a jury could reasonably conclude she altered her story regarding a material fact in the case because there was a greater possibility that the Appellees would be held accountable for their (illegal) conduct after Mr. Watkins filed his lawsuit; in contrast, Black had (rightly) concluded that speaking truthfully to Internal Affairs would not cause Douglas County to take any meaningful adverse action against her or the other Appellees. Aplt.App.-2-229.

- Black also falsely stated under oath in her Statement in Support of Warrantless Arrest that "Deputy Nichols asked Bryce to come down stairs and talk with him. Bryce refused." In fact, uncontroverted BWC footage plainly shows that Mr. Watkins *did* comply with Nichols' command to come down the stairs by coming down his stairs. Even Nichols conceded that Black's report had falsely described Mr. Watkins' conduct by exaggerating

his alleged noncompliance with the police. Aplt.App.-3-140-41; Aplt.App.-2-206; Aplt.App.-2-85, Black BWC at 18:51-19:32.

- Black falsely testified that Nichols told her that Ms. Watkins had given the police explicit consent to enter Mr. Watkins' home before she initially entered the garage but, the truth is, Nichols had explicitly told her that he *did not* ask Ms. Watkins for explicit consent before Black went into the garage. Aplt.App.-2-216-17; Aplt.App.-2-86, Wunderlich BWC at 15:56:30.

- For his part, Nichols denied during his deposition that Mr. Watkins ever told him that the police could not enter his home, but he previously told Black that Mr. Watkins *had* clearly told him on the phone that the police could not enter his home. Both things cannot be true. Aplt.App.-2-252-53; Aplt.App.-2-260 Black IA interview 13:56:15 to 13:56:49; Aplt.App.-2-228

- Nichols falsely stated in his police report that Mr. Watkins lost his footing when going up the stairs but the BWC footage actually shows that he deliberately slammed Mr. Watkins to the ground. Aplt.App.-3-38; Aplt.App.-2-206; Aplt.App.-2-85, Black BWC at 18:51-19:32; Aplt.App.-2-263.

- About four months after the events underlying Mr. Watkins' case, the Douglas County Sheriff's Office disciplined Wunderlich for falsely charging an individual with a crime he did not commit. The County found that

18

Wunderlich "rubber-stamped a report against an individual who was charged with a crime he didn't commit" and that "[t]his is not a minor mistake." The County added: "You have been in a management position in this organization since 1992.  You quite simply have no excuse." Thus, a serious and legitimate jury question exists regarding Wunderlich's credibility too. Aplt.App.-3-151.

- Appellees' insistence that they had absolutely no idea that Mr. Watkins did not want the police in his home even though they knew Mr. Watkins had refused to interact with the police also could reasonably be rejected as false by a jury. A jury could reasonably conclude that the Appellees all knew Mr. Watkins had clearly refused to consent to the police being in his home, given his refusal to even talk with the police before any Appellee entered his home, and that entering his home under the circumstances was therefore unreasonable under the Fourth Amendment. Aplt.App.-2-200; Aplt.App.-2-225; Aplt.App.-2-237.

- Appellees' decision to surreptitiously enter Mr. Watkins' garage with the code Ms. Watkins provided in order to initiate contact with Mr. Watkins supplies further proof that Appellees knew Mr. Watkins did not want the police in his house; commonsense dictates that Appellees would have requested permission from Mr. Watkins to enter his home before entering it

19

if they thought there was an actual chance he would consent. Aplt.App.-2-252-53; Aplt.App.-2-Black IA interview 13:56:15 to 13:56:49; Aplt.App.-2-228; Aplt.App.-2-83, Nichols BWC at 15:52:25-15:52:31; Aplt.App.-2-196 ("no possible basis, based on [his] knowledge and observations, that anyone could have thought at that moment, when [Nichols] and Ms. Black first went into Mr. Watkins' garage, that Ms. Watkins had explicitly consented to the entry"); Aplt.App.-2-239; Aplt.App.-2-203.

- Before entering Mr. Watkins' home, Appellees also knew Mr. Watkins had refused to come to the door after they rang the doorbell multiple times; this supplies further proof that Appellees knew Mr. Watkins did not want to even interact with the police, much less let the police into his private home. Aplt.App.-2-225.

- No Appellee ever asked Mr. Watkins if they could enter his home, though Nichols admitted that he knew based on his training and experience that it is relevant to ask a homeowner for consent to enter their home before entering their home based on consent. That is because Appellees knew Mr. Watkins did not want them in his house, planned to enter Mr. Watkins' home regardless of what Mr. Watkins had to say about it, and did not want Mr. Watkins' non-consent to clearly be captured on their BWCs (as Nichols

knew, what Mr. Watkins said to him on the phone was not recorded).
Aplt.App.-2-199

- After admitting to Wunderlich that he had not obtained even Ms. Watkin's explicit consent to enter Mr. Watkins' home, Nichols reentered Mr. Watkins' garage to drag a trashcan into the threshold between the garage interior and driveway in order to prevent Mr. Watkins from potentially closing the garage. This supplies even more proof Appellees knew Mr. Watkins did not want the police in his home. Aplt.App.-2-203.

- Appellees intentionally muted their BWCs multiple times when they were on scene, thereby concealing evidence related to, e.g., their attempts to get their stories straight right after violating Mr. Watkins' rights and discussions related to what Mr. Watkins told Nichols on the phone. Aplt.App.-2-83, Nichols BWC at 15:55:32; Aplt.App.-2-85, Black BWC at 15:56, 16:16:00, 16:18:41, 16:21:47; Aplt.App.-2-86, Wunderlich BWC at 16:15:52; Aplt.App.-2-220.

- Mr. Watkins was never convicted of any offense related to his interaction with law enforcement. Aplt.App.-2-205.

- A judge has already determined that the Appellees violated Mr. Watkins' rights by illegally entering his home, in violation of the Fourth Amendment to the United States Constitution. 18th Judicial District Court Judge Theresa

Slade granted Mr. Watkins' motion to suppress after an evidentiary hearing
involving testimony by Nichols and presentation of BWC video. Judge Slade
found that the Appellees entered the home without a search warrant, without
valid consent, and without justification based on exigent circumstance, and
therefore held: "**I am finding that the officers did make an unlawful
entry into the home and suppress evidence obtained following that entry
and that starts from the garage**." Aplt.App.-2-102.

- Mr. Watkins suffered significant and legitimate injuries from the force the
  Appellees unjustifiably inflicted on him, including not limited to severe
  pain, bruising around his wrists that lasted for more than a week, lingering
  damage to at least his finger, and severe emotional distress. Aplt.App.-1-21,
  32-33, 38-39; Aplt.App.-2-86, Wunderlich BWC 16:08:25-16:09:15;
  Aplt.App.-2-210; Aplt.App.-2-255-56; Aplt.App.-2-263.

## II.    <u>Procedural Background</u>

Mr. Watkins filed a federal civil rights lawsuit against Appellees on April
27, 2020. Aplt.App.-1-18. The District Court subsequently granted in part and
denied in part Appellees' motion to dismiss Mr. Watkins' complaint pursuant to
Fed. R. Civ. P. 12(b)(6). Aplt.App.-1-213, Aplt.App.-2-4. At the time that the
District Court ruled on Appellees' motion for summary judgment, Mr. Watkins had
the following claims against Appellees pursuant to 42 U.S.C. 1983: (1) unlawful

entry/search into Appellant's home against Nichols; (2) unlawful entry/search into Appellant's garage only against Black; and (3) excessive force against Nichols, Black, and Wunderlich. *Id*.

In its September 22, 2022 summary judgment order, the District Court held that no reasonable jury could conclude that any of the Appellees entered and searched Mr. Watkins' home illegally. The District Court further held that no Appellee subjected Mr. Watkins to excessive force inside his home. The District Court therefore granted Appellees' motion for summary judgment and dismissed all of Mr. Watkins' claims against all of the Appellees. *See* Aplt.App.-3-220.

5. **SUMMARY OF THE ARGUMENT**

Under the Fourth Amendment to the United States Constitution, "a man's home is his castle [to the point that t]he poorest man may in his cottage bid defiance to all the forces of the Crown." *Georgia v. Randolph*, 547 U.S. 103, 126 (2006) (alterations in original) (internal quotation marks omitted). "We have … lived our whole national history with an understanding of [that adage]." *Id*. The Douglas County Sheriff's Office ("DCSO") Appellees, however, disregarded this and other clearly established law that lies at the core of the Fourth Amendment's protections by unreasonably storming into Appellant Bryce Watkins' home – repeatedly – without a search warrant or exigency, and despite knowing that Mr. Watkins had refused to grant the police permission to enter his home. The

Appellees also unjustifiably beat Mr. Watkins inside his home, inflicting significant injuries on him.

Even the Appellees have conceded that they all initially entered Mr. Watkins' home via his garage without a search warrant, exigent circumstance, or the clear consent of *any* resident. They also knew Mr. Watkins had unequivocally refused to let the police in his home. Thus, a jury question exists as to whether Appellees Black and Nichols had legal justification under the Fourth Amendment to initially enter Mr. Watkins' home because there is no reasonable basis for the police to enter a home in such circumstances. The District Court erroneously held otherwise.

Appellees later reentered Mr. Watkins' home with weapons drawn after finally obtaining the explicit consent of Mr. Watkins' wife at the time, but a reasonable jury could conclude that Nichols entered Mr. Watkins' home illegally (again) because he knew that Mr. Watkins, a physically present resident, had unequivocally refused to consent to the police entering his home before he ever entered it. Non-consent trumps consent under clearly established United States Supreme Court precedent in such a scenario. *See Randolph*, 547 U.S. 103. The District Court erroneously held otherwise.

Appellees Black, Nichols, and Wunderlich subsequently subjected Mr. Watkins to excessive force inside his home that they were illegally occupying by,

acting in concert, forcefully slamming him to the ground twice, choking him twice, placing him under hundreds of pounds of crushing bodyweight, and then leaving him in excessively tight handcuffs that inflicted significant and lasting injuries on him for hours. At no time did Mr. Watkins threaten anyone in his house and, even according to the Appellees, Mr. Watkins' only so-called "resistance" was trying to escape their brutal and unwarranted beating of him merely by going up his stairs to the second floor. (Mr. Watkins peacefully retreating up his stairs in terror plainly did not provide the Appellees with legal justification to use the substantial level of force that they did.) Moreover, Mr. Watkins suffered significant injuries from the force the Appellees inflicted on him, including not limited to unnecessary and severe pain, bruising, lingering damage to at least his finger, and severe emotional distress. Thus, summary judgment should not have been granted on Plaintiff's excessive force claim against any Appellee. Appellant therefore respectfully requests that this Court reverse the District Court's summary judgment order and remand the matter for a jury trial.

## 6.  STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment and legal conclusions *de novo*. *Woodman v. Runyon*, 132 F.3d 1330, 1337 (10th Cir. 1997). Summary judgment is only appropriate if the record contains no evidence of a genuine issue of material fact and demonstrates that the moving party is entitled to

judgment as a matter of law. *Id.* The nonmovant is given "wide berth to prove a factual controversy exists." *Id.* (internal citation omitted). In making this determination, the District Court must view the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Id.*

When the defendant has asserted qualified immunity, this Court "still view[s] the facts in the light most favorable to the non-moving party and resolve[s] all factual disputes and reasonable inferences in its favor." *Walton v. Gomez (In re Estate of Booker)*, 745 F.3d 405, 411 (10th Cir. 2014). However, "the plaintiff would bear the ultimate burden of persuasion at trial to overcome qualified immunity by showing a violation of clearly established federal law." *Id.* Therefore, this Court must deny qualified immunity where a plaintiff demonstrates "(1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Id.* This Court has made clear that even in the qualified immunity context, "[w]hen the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be 'properly denied.'" *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002).

**7. <u>ARGUMENT</u>**

**I.    <u>Appellees Nichols and Black illegally entered Appellant Watkins' home.</u>**

26

"At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Kyllo v. United States*, 533 U.S. 27, 31 (2001). "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). Exceptions to the warrant requirement of the Fourth Amendment should be "well delineated" and "jealously and carefully drawn." *United States v. Aquino*, 836 F.2d 1268, 1271 (10th Cir. 1988). One "jealously and carefully drawn" exception recognizes the validity of searches with the voluntary consent of an individual possessing authority. *Randolph*, 547 U.S. at 109 (citations omitted).

Here, Appellees lacked a warrant authorizing them to enter Mr. Watkins' home to arrest him and had no exigent basis upon which to enter Mr. Watkins' home. Aplt.App.-2- 182 (OSUMF[4] Nos. 57, 59). Thus, the central question is whether Appellees Black or Nichols reasonably believed that they had a lawful basis to enter based on the consent of a resident (because only clear consent would have provided a valid basis for the police to enter Mr. Watkins' home under the circumstances.) The answer to that question is "no". Consent must be "unequivocal

---

[4] This acronym refers to "Opposing Party's Response and Additional Facts and Supporting Evidence" in Appellant's summary judgment briefing. Appellant refers to specific paragraphs in that briefing here to make clear that he presented these issues/facts to the District Court.

and specific" in order to permit the police to enter a home based on consent. *See United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996). While "[c]onsent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer[,] **consent must be clear**[.]" *Chivers v. Reaves*, No. 1:13-cv-00171, 2017 U.S. Dist. LEXIS 159397, at *44-45 (D. Utah Sep. 26, 2017) (collecting cases) (emphasis in original altered).

Here, a jury could reasonably find that it was objectively unreasonable for Black or Nichols to conclude that *either* resident had *clearly* consented to a home entry before they entered Mr. Watkins' home the first time via his private garage[5]. No one has ever claimed that they believed Mr. Watkins had consented to a home entry; to the contrary, it was abundantly clear to all Appellees that Mr. Watkins did not want the police in his home. Aplt.App.-2-183 (OSUMF No. 65). Additionally, both Nichols and Black knew that even Ms. Watkins *had not* explicitly given the police permission to be in the home either when they went into the garage. Aplt.App.-2- 167 (OSUMF No. 20). Even if Mrs. Watkins may have provided some sort of implied consent for entry into the residence before Appellees initially entered the garage, "[t]his raises a factual dispute as to whether Black had a

---

[5] There has never been any dispute in this case that Appellant's garage was part of his home.

reasonable belief that she had consent to enter the garage." Aplt.App.-1-131, Aplt.App.-2-4. Given that Nichols unequivocally told Black that the police *did not* have unequivocal and specific consent to enter the home before she ever entered the garage, a reasonable jury certainly could find that her belief was objectively unreasonable. Aplt.App.-2-167-68, 183 (OSUMF Nos. 20, 22-23, 64). Mr. Watkins' claim against Black based on her initial entry into the garage should have proceeded to trial.

Mr. Watkins' unlawful entry claim against Nichols and Black also should not have been summarily judged because they (repeatedly) invaded Mr. Watkins' home "over the express refusal of consent by a physically present resident."[6] Aplt.App.-2-165 (OSUMF No. 16); *Randolph*, 547 U.S. at 120. In 2006, the United States Supreme Court held in *Georgia v. Randolph* that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." 547 U.S. at 120. "Whether the basis for such authority exists is the sort of recurring factual question to which law enforcement officials must be expected to apply their judgment; and all the Fourth

---

[6] As discussed in the facts section above, a reasonable jury also could conclude that Black knew that Mr. Watkins had expressly refused to permit the police into his home based on his conduct.

Amendment requires is that they answer it reasonably." *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990).

Just like the objecting co-occupant in *Randolph* whose objection nullified the consent of another resident, Mr. Watkins, a physically present resident, expressly told Nichols that the police could not enter his home during their phone call that occurred soon before the police entered Mr. Watkins' home (in a conversation not recorded on body camera footage, thereby creating a fact dispute as to what Mr. Watkins said to Nichols). Aplt.App.-2-165 (OSUMF No. 16). This fact was sufficient to override any consent Ms. Watkins may have provided, was sufficient to defeat Nichols' motion to dismiss Mr. Watkins' unlawful entry/search claim, and should have been sufficient to defeat Appellees' motion for summary judgment on Mr. Watkins' unlawful entry/search claim as well. *See* Aplt.App.-1-213; Aplt.App.-2-4; Aplt.App.-3-224-26.

Additional evidence reinforces the conclusion that Nichols (and Black) knew Plaintiff clearly did not want the police in his house before they entered it. Objective reasonableness is the lynchpin of the Fourth Amendment analysis here. Mr. Watkins' words and actions about which Appellees were aware manifestly conveyed the message that the police could not enter his home – a message he had a right to communicate. Aplt.App.-2-165, 188-89 (OSUMF Nos. 17, 85-89); *Kentucky v. King*, 131 S. Ct. 1849, 1862 (2011) ("[I]f an occupant chooses to open

the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time."). Obviously, a person who has repeatedly refused to talk with the police and locked their doors to the police does not want the police invading their private home either.[7]

Further, Wunderlich outright conceded that consent simply did not factor at all into Appellees' reasoning for invading Plaintiff's home at the time. Aplt.App.-2-81-82 (OSUMF No. 56). Instead, the Appellees went inside to arrest him merely because he communicated that he would not voluntarily speak with the police, and it was easier to arrest him right then and there, inside his home, than to wait for him to leave. Aplt.App.-2-81-83 (OSUMF Nos. 56, 68).

Mr. Watkins again unequivocally conveyed his non-consent to law enforcement being in his home when the Appellees were inside near the base of his stairs. Aplt.App.-2-171-72 (OSUMF No. 31). However, rather than leave immediately (as they should have done), the Appellees instead remained inside and

---

[7] The District Court incorrectly disregarded the statements and conduct of Mr. Watkins plainly communicating his non-consent to the police entering his home when finding "that no statements or conduct tending to show that Plaintiff did not want the officers in his home—made either beforehand or during his arrest— overrode or revoked the consent given by his wife." Aplt.App.-3-226. On this point (and others), the District Court wrongly failed to view the facts in the light most favorable to the non-moving party and resolve all factual disputes and reasonable inferences in its favor.

proceeded to physically attack him on the staircase leading to the second floor.
Aplt.App.-2-72-78 (OSUMF Nos. 32-44); *see also Manzanares v. Higdon*, 575
F.3d 1135, 1143 (10th Cir. 2009) (once a resident revokes the consent that
permitted officers to enter their home or conduct a search, the officers should
promptly leave, unless the officers have independent legal authority to remain);
*Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999) ("Th[e] search should
have terminated instantly upon Painter's revocation of consent, and the officers
should have promptly departed the premises (assuming they possessed no
independent legal authority to remain)."). Accordingly, Appellees Black and
Nichols entered Plaintiff's home illegally, and the First Claim for Relief against
them should have proceeded to trial.

A.    ***Randolph* applies to all circumstances when the expressly objecting occupant is physically present in their home, as Mr. Watkins was here.**

The fact that Mr. Watkins was in a different location in his home than
Randolph had been when he expressly refused to permit law enforcement into his
home is a distinction without a difference because the central holding of *Randolph*
was that a "physically present inhabitant's express refusal of consent to a police
search [of his residence] is dispositive as to him, regardless of the consent of a
fellow occupant." 547 U.S. at 122-23. The District Court erroneously construed
*Randolph* far too narrowly. Aplt.App.-3-224-26.

As an initial matter, the fact that this case involves "officers [who] were not conducting a search but effecting an arrest" has no legal relevance. Aplt.App.-3-225. As the Supreme Court held more than forty years ago in *Payton*, when addressing police entry of a home to effectuate an arrest, a "basic principle of Fourth Amendment law [is] that searches **and seizures** inside a man's house without warrant are *per se* unreasonable in the absence of some one of a number of well defined 'exigent circumstances.'" *Payton v. New York*, 445 U.S. 573, 586 n.25, 100 S. Ct. 1371, 1380 (1980) (emphasis added); *see also Lange v. California*, 141 S. Ct. 2011, 2018-19 (2021) ("An officer may always enter a home with a proper warrant. And as just described, exigent circumstances allow even warrantless intrusions. But the contours of that or any other warrant exception permitting home entry are jealously and carefully drawn, in keeping with the centuries-old principle that the home is entitled to special protection."); *Caniglia v. Strom*, 141 S. Ct. 1596, 1600 (2021) ("This Court has repeatedly declined to expand the scope of exceptions to the warrant requirement to permit warrantless entry into the home.").

> Although *Randolph* was decided in the context of an evidentiary search, there is no talismanic distinction, for Fourth Amendment purposes, between a warrantless "entry" and a warrantless "search." "The two intrusions share this fundamental characteristic: the breach of the entrance to an individual's home." *See Payton*, 445 U.S. at 589. As a matter of clearly established law, "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590.

33

*Bonivert v. City of Clarkston*, 883 F.3d 865, 874 (9th Cir. 2018).

Thus, the law is clear that the police cannot enter a home to effectuate an arrest without a search or arrest warrant and/or valid consent from resident(s) unless exigent circumstances are present. While the *Randolph* Court did address circumstances when the police could lawfully enter a home for reasons separate from conducting a search, the Court was describing exigent circumstances (*see* 547 U.S. at 118-19) – a circumstance that even Appellees have acknowledged did not exist here. Therefore, the reasoning of *Randolph* applies to the instant case even though Appellees entered Plaintiff's home for the purpose of arresting him.

In addition, Mr. Watkins' precise location inside his home when he unequivocally objected to the police entering his home is unimportant. What matters is that Mr. Watkins was physically present when he unequivocally objected to the police entering his home entry and that he objected before the entry occurred. Mr. Watkins' non-consent should have reigned supreme in such an instance, pursuant to *Randolph*, given that a reasonable jury could find that Nichols (and Black) were aware of his unequivocal non-consent before they entered. *See also Manzanares*, 575 F.3d at 1143 (citing *Gates*, 537 F.3d at 426 (("[I]f . . . [one of the plaintiffs] revoked that consent upon his return home, the defendants violated the [plaintiffs'] Fourth Amendment rights by remaining in the house, absent a court order or exigent circumstances.")).

In contrast, the objecting co-resident *was not* present in his home in *Fernandez v. California*, 571 U.S. 292 (2014) when the police searched his home. This was a dispositive fact in the case that distinguished it from *Randolph*. *See Fernandez*, 571 U.S. at 301 (*Randolph* went "to great lengths to make clear that its holding was limited to situations in which the objecting occupant is present."); *id*. at 304 (drawing line at scenario "when the objector is not on the scene"). Indeed, the *Fernandez* court went on to explain that **the requirement of physical presence is not restricted to presence at "the threshold" of the residence; it refers instead to "presence on the premises to be searched"** *id*. at 304, 306; *see also United States v. Montoya*, No. 15-cr-4080 WJ, 2016 U.S. Dist. LEXIS 152828, at *22 (D.N.M. Nov. 2, 2016) (holding that, in light of *Fernandez*, "The Court's holding in *Randolph* is limited to situations where the objecting occupant is physically present."). Thus, Mr. Watkins' "stated refusal to permit entry prevail[ed]" over his wife's consent because he was a physically present co-occupant, "rendering the warrantless search unreasonable and invalid as to him." *Randolph*, 547 U.S. at 106.[8]

---

[8] Each Appellee had an independent duty to assess the constitutionality of their conduct. *McInerney v. King*, 791 F.3d 1224 (10th Cir. 2015). This defeats any Appellee's claim that they justifiably entered Plaintiff's home because another Appellee had already entered.

The Sixth Circuit, in *United States v. Tatman*, 397 F. App'x 152, 161-62 (6th Cir. 2010), rejected the same, extremely narrow reading of *Randolph* that the District Court incorrectly endorsed here:

> The Government relies heavily on *Randolph*'s description of a successfully objecting co-tenant as someone who "is in fact at the door and objects," rather than "the potential objector, nearby but not invited to take part in the threshold colloquy." *Id.* However, we note that the Court varied the language it used to describe a person in the *Randolph* defendant's position, indicating that it did not intend the "at the door" language to be talismanic. *See, e.g.*, *Randolph*, 547 U.S. at 106 (someone who "is present at the scene and expressly refuses to consent"); *id.* ("a physically present co-occupant[] [who has] stated [his] refusal to permit entry"); *id.* at 108 ("a co-tenant who is present and states a refusal to permit the search"); *id.* at 109 ("a second occupant physically present and refusing permission to search"); *id.* at 114 ("a present and objecting co-tenant"); *id.* at 119 (a co-tenant "standing at the door and expressly refusing consent"); *id.* at 120 ("the express refusal of consent by a physically present resident"); *id.* at 121 ("a physically present fellow tenant [who] objects"); *id.* ("a potential defendant with self-interest in objecting [who] is in fact at the door and objects" as opposed to a "potential objector, nearby but not invited to take part in the threshold colloquy"); *id.* (a "fellow occupant on hand" who objects) . . . What is significant is that Tatman was physically present and *actually objected* while Clark was standing at the threshold of his house before the search began, distinguishing him from the nearby, "potential objector[s]" in *Matlock* and *Rodriguez*. *Randolph*, 547 U.S. at 121. That he voiced this objection from the top, rather than the foot, of his staircase does not change this fact.

*United States v. Tatman*, 397 F. App'x 152, 161-62 (6th Cir. 2010); Appx. V3 224-26. *Tatman* remains good law after *Fernandez*.

Indeed, to the extent *Fernandez* has any impact on Mr. Watkin's unlawful entry/search claim, it is best described as *confirming* that Appellees entered his

home illegally because *Fernandez* stands for the proposition that the question of consent – at least in competing consent cases – should focus on the resident(s) who are in their home at the time. *See Fernandez*, 571 U.S. at 294 ("In this case, we consider whether *Randolph* applies if the objecting occupant is absent when another occupant consents."). There, the resident who did not consent to the police being in his home was outside his home and, thus, his non-consent was deemed to carry insufficient legal weight to override the consent of a co-occupant who was physically present at the house. Conversely, the *only* resident of Mr. Watkins' home who was physically present in the home was Mr. Watkins – and he expressly stated and otherwise unequivocally communicated that the police could not enter his home before any officer entered it. *See United States v. Johnson*, 656 F.3d 375, 377 (6th Cir. 2011) ("in situations where one co-tenant consents to a search but another, physically present co-tenant expressly refuses consent, a warrantless search is not reasonable as to the objecting co-tenant[]").

### B. <u>There is no *per se* domestic violence exception to the Fourth Amendment.</u>

Seeking to escape the clear message of *Randolph* – which is that Mr. Watkins' unlawful entry/search claim should proceed to trial – Appellees went to great lengths to argue to the District Court,[9] with a dearth of legal support, that

---

[9] Appellee addresses this argument out of an abundance of caution, though the District Court did not rely upon it in its summary judgment order.

there is an expansive domestic violence exception to the Fourth Amendment.

Appellees claimed, for instance, that *Randolph* did not address "the capacity of the

police to protect domestic victims." Aplt.App.-2-49. Even if that is true with

respect to the contours of exigent circumstances, courts "**have held, almost**

**uniformly, that once a victim of domestic violence is removed from the**

**situation, the exigency required to justify a warrantless entry is also**

**removed**[,]" as was the case here with Ms. Watkins. *See United States v. Lopez*,

No. 2:08-CR-94, 2009 U.S. Dist. LEXIS 30941, at *12-13 (E.D. Tenn. Apr. 13,

2009)[10] (emphasis added)

 Likewise, the law in the Tenth Circuit has been clear since at least 2002 that

"**an officer's warrantless entry of a residence during a domestic call is not**

**exempt from the requirement of demonstrating exigent circumstances**." *Davis*,

290 F.3d at 1244 (emphasis added); *see also Storey*, 696 F.3d at 994. In *Davis*, the

Tenth Circuit held that the district court properly granted Davis's motion to

---

[10] Courts in the Tenth Circuit and elsewhere have consistently continued following the holding announced in *Lopez* (and the many cases cited therein) in the years since *Lopez* was decided. *See, e.g., Storey v. Taylor*, 696 F.3d 987, 994 (10th Cir. 2012); *Dagdagan v. Wentz*, 428 F. App'x 683, 684 (9th Cir. 2011); *Rouzan v. Thomas*, No. CV 12-10352-BRO JPR, 2014 U.S. Dist. LEXIS 80348, 2014 WL 2586797, at *12 (C.D. Cal. Apr. 21, 2014), *report and recommendation adopted*, No. CV 12-10352-BRO JPR, 2014 U.S. Dist. LEXIS 80338, 2014 WL 2586837 (C.D. Cal. June 6, 2014) (citing *United States v. Espinoza*, 403 F. App'x 239, 241 (9th Cir. 2010)); *see also United States v. Neadeau*, No. 17-cr-173 (SRN/LIB), 2017 U.S. Dist. LEXIS 214515, at *21-24 (D. Minn. Nov. 6, 2017).

suppress. There, officers responded to a domestic disturbance report for noise shortly before 5:30 a.m. but observed no evidence of a disturbance before knocking on the front door. Officers knocked, and Davis opened the front door of the house in his boxer shorts; he had alcohol on his breath and bloodshot eyes. Davis's female partner soon arrived at the door as well. The officers asked for consent to search, which Davis and his partner denied. One of the officers stated they were coming in any way to check on the welfare of Davis's partner; in response, Davis ordered his partner to go outside while he retreated into the house. The officers then entered the house because they claimed to have been concerned for officer safety. Rejecting the officers' contention that an exigency existed, the court held:

> There was no evidence introduced that indicated the officers believed Mr. Davis had a reputation for violence. Nor had he displayed a threatening or aggressive manner when he initially contacted the officers. It is true he lied about Ms. Coleman's whereabouts, but any concern that lie might have effected was allayed when she appeared without any signs of harm. Moreover, the only manifestation of resistance displayed by Mr. Davis was his insistence upon keeping the officers outside. As the district court noted, even Ms. Coleman, "the suspected victim[,] was trying to prevent" the officers from entering Mr. Davis' residence. *United States v. Davis*, 2001 U.S. Dist. LEXIS 13713, No. 01-40036-01- RDR, 2001 WL 1013313, at *4 (D. Kan. Aug. 7, 2001). The court therefore logically concluded the officers "obviously . . . could [have] checked her condition without entering the home." *Id.*

*Id*. at 1243. Here, like *Davis*, the suspected victim, Ms. Watkins, was clearly visible to law enforcement before the entry and safely standing outside in a park at the time. Aplt.App.-2-163-64, 167-69 (OSUMF Nos. 11-15, 21, 24). Indeed, **Appellees have *conceded* that there was no exigent circumstance when they entered Mr. Watkins' home.** Aplt.App.-2-182 (OSUMF No. 59). Meanwhile, Appellant is not aware of any persuasive or binding authority holding that the police can lawfully enter a home without an exigency, search warrant, or valid consent solely because of alleged domestic violence. The binding and persuasive authority cited above instead shows that the same Fourth Amendment requirements apply to alleged domestic violence cases as all other cases.

### C.    Neither Nichols nor Black can receive qualified immunity from Plaintiff's unlawful entry/search claim.

Qualified immunity does not shield Black or Nichols from Appellee's unlawful entry/search Fourth Amendment claim. The following legal principles that are central to Mr. Watkins' unlawful entry/search claim – which collectively show these two Appellees are properly held liable under the claim – were clearly established by April 2018 when the events underlying the case occurred:

- "[A] warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Randolph*, 547 U.S. at 120. *Randolph* defeats Nichols' and

Black's assertion of qualified immunity because they knew Mr. Watkins had

expressly refused to consent to a home entry before ever entering his home.

*See also Bonivert v. City of Clarkston*, 883 F.3d 865 (9th Cir. 2018)

(rejecting police officers' request for qualified immunity under the plaintiff's

Fourth Amendment claim pursuant to *Randolph*, where a physically present

resident twice objected to officers entering his home, first by audibly locking

the door as an officer were approaching it and second by attempting to close

the door on officers around the time an officer attempted to enter this home,

and noting as part of its holding that the law is clearly established that

express non-consent can be communicated through non-verbal conduct)[11].

Even Appellees have admitted that, if Mr. Watkins told Nichols on the

phone that the police could not come into his house, then the police would

not have had legal authority to enter his home.

---

[11] In rejecting the officers' request for qualified immunity, the court in *Bonivert* also considered it to be significant that an officer had subjectively concluded that the plaintiff did not want the police to enter his home. *Bonivert v. City of Clarkston*, 883 F.3d 865, 876 (9th Cir. 2018) Likewise, a reasonable jury here could conclude that the Appellees subjectively believed that Mr. Watkins was clearly refusing to permit the police to enter his home before they entered it. While this fact may not be dispositive under the Fourth Amendment's objective reasonableness standard, it does reinforce the conclusion that at least Nichols and Black are properly held liable for unreasonably entering Mr. Watkins' home.

- Consent – and express lack of consent – to the police entering a home can be communicated non-verbally and officers' perception of consent (or lack thereof) is subject to the Fourth Amendment reasonableness analysis (as discussed, a reasonable jury here could conclude that it was objectively unreasonable for an officer to have believed that Mr. Watkins had *not* expressly refused to permit the police to enter his home based on his conduct). *See United States v. Jones*, 701 F.3d 1300, 1321 (10th Cir. 2012); *see also Bonivert*, 883 F.3d at 875 (citing *Randolph* and collecting cases); *Vinson v. Vermilion Cty.*, 776 F.3d 924, 930 (7th Cir. 2015); *United States v. Williams*, 521 F.3d 902, 907 (8th Cir. 2008) (citing *Randolph*); *Cummings v. City of Akron*, 418 F.3d 676, 679, 685 (6th Cir. 2005).

- To constitute legally valid "consent" under the Fourth Amendment, consent must be "unequivocal and specific." *McRae*, 81 F.3d at 1537. This binding Tenth Circuit case law from 1996 creates a factual dispute as to whether Black and Nichols reasonably believed that the police had even Ms. Watkins' legally valid consent to enter the garage before they first entered it.

- A garage (like Mr. Watkins') that is fully enclosed by walls and a roof and attached to a home is considered part of that home and is entitled to the full Fourth Amendment protections given to homes. *United States v. Dunn*, 480

U.S. 294, 301 (1987); *Taylor v. United States*, 286 U.S. 1, 6 (1932); *United States v. Oaxaca*, 233 F.3d 1154, 1157-58 (9th Cir. 2000).

- "[I]f an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time." *King*, 131 S. Ct. at 1862.

- Legal authority to arrest a person who is in their home does not, without more (i.e., consent, a search warrant, or an exigency), provide legal authority for law enforcement to enter the home to make an arrest. *Payton*, 445 U.S. 586.

- Once a person revokes the consent that permitted officers to enter the home or conduct a search (as Mr. Watkins unequivocally did here), the officers should promptly leave, unless the officers have independent legal authority to remain (which the Appellees lacked here). *Manzanares*, 575 F.3d at 1143.

Because the District Court erred in dismissing Mr. Watkins' Fourth Amendment claim against Black and Nichols based on their unlawful entry of his home, the court's portion of the summary judgment order addressing that issue should be reversed.

## II.    Appellees Nichols, Black, and Wunderlich subjected Appellant Watkins to excessive force inside his home.

The Fourth Amendment prohibits law enforcement from using excessive force. In determining the reasonableness of officers' force used in the course of an

arrest, courts examine "whether the officers' actions [were] objectively reasonable in light of the facts and circumstances confronting them, without regard to underlying intent or motivation." *Weigel v. Broad*, 544 F.3d 1143, 1151(10th Cir. 2008). The totality of the circumstances must be considered in each case, with particular focus on (1) the severity of the crime; (2) whether the suspect posed an immediate threat; (3) and whether they were actively resisting arrest or attempting to flee. *Graham v. Connor*, 490 U.S. 386, 396 (1989). "Unreasonable actions include the use of excessive force or restraints that cause unnecessary pain or are imposed for prolonged and unnecessary period of time." *L.A. County v. Rettele*, 550 U.S. 609, 614 (2007).

Here, Mr. Watkins was not actively or passively resisting officers, threatening anyone at the time[12], or attempting to flee from his home[13] Aplt.App.-

---

[12] While Mr. Watkins was suspected of being involved in a domestic violence incident with Ms. Watkins, the Appellees all knew that Ms. Watkins was outside of the home and safe at the time and had no reason to believe anyone else was inside Mr. Watkins's home besides him. Moreover, the Appellees all knew that this reported incident had not occurred recently but had instead reportedly transpired on a previous day.

[13] As discussed above in Section I of the Argument, Mr. Watkins had a right to be in his home and to demand that law enforcement leave his home. Thus, any effort he may have made to go from one room to another in his own room under the circumstances does not amount to improperly fleeing from the scene because he lawfully could move about freely in his home without law enforcement being present at all (much less yelling at him, pointing deadly weapons at him, and then subjecting him to excessive force, as the Appellees did here). *See Rozycki v. City of Champlin*, No. 15–589 (JRT/FLN), 2016 WL 7493619, at *14 (D. Minn. Dec. 30,

2-175-77 (OSUMF Nos. 40, 42, 43). Moreover, Appellees failed to give Mr.

Watkins a meaningful chance to comply with their orders Aplt.App.-2-175-76

(OSUMF No. 40) other than the order for him to come down his stairs, which he

*did* comply with Aplt.App.-2-172-74 (OSUMF Nos. 32, 36). Appellees also never

told Mr. Watkins he was under arrest or explained why they had surreptitiously

invaded his home Aplt.App.-2-175-76 (OSUMF Nos. 40-41, 46-47), and had no

particularized basis to believe Mr. Watkins was armed (he had just left the shower

and was only wearing a towel) or even had firearms in the home Aplt.App.-2-164,

172-73 (OSUMF Nos. 13, 32). Nonetheless, the Appellees, acting in concert,

subjected Mr. Watkins to at least the objectively unreasonable force that follows:

---

2016); *see also United States v. Santana*, 427 U.S. 38, 43 (1976) (describing so-called "hot pursuit" doctrine as follows: "[A] suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place.") (emphasis added). Furthermore, even assuming that Mr. Watkins did "flee" merely by trying to retreat up his stairs towards his own bedroom, this only occurred because the Appellees "own 'reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'" *Allen v. Muskogee, Okl.*, 119 F.3d 837, 840 (10th Cir. 1997); *see also Medina v. Cram,* 252 F.3d 1124, 1132 (10th Cir. 2001) (explaining how unreasonable police conduct creating arguable need to use force can itself give rise to excessive force claim). Had the Appellees not unreasonably invaded Mr. Watkins's home and subsequently unreasonably failed to explain what they were doing in his home, then he would not have instinctively tried to get away from them in terror. Thus, his purported act of "fleeing" under the circumstances did not give any Appellee justification to subject him to physical force. *See id*.; *see also Bouchard v. Whetstone*, 772 F. Supp. 2d 1352, 1360 (D. Colo. 2011) ("If, ultimately, a fact finder determines that the seizures, the entry into Bouchard's house and the restraint of Bouchard, were not proper, then the justifications for the police officers' use of force against Bouchard also come into question.")

- Nichols grabbed and tackled him, throwing Mr. Watkins down hard to the ground with his back pointed towards the stairs, right after Mr. Watkins took just a few steps backwards up the staircase. Aplt.App.-2-175-77 (OSUMF Nos. 40-42).

- Additionally, Nichols clenched Mr. Watkins' neck with one of his hands and intentionally choked him at this time. Aplt.App.-2-177 (OSUMF No. 43).

- A little later, Wunderlich threw Mr. Watkins down to the ground very hard (again), this time face-first. Aplt.App.-2-177-78 (OSUMF No. 44).

- Wunderlich then crushed Mr. Watkins' body while he was lying face-down on his stairs and was complying with commands under more than 250 pounds of bodyweight. Aplt.App.-2-185 (OSUMF No. 76),

- Nichols then intentionally excessively tightly handcuffed Mr. Watkins hands behind his back, while he was still lying naked on the staircase, which caused significant pain and other injuries to Mr. Watkins' wrists. Aplt.App.-2-178-79 (OSUMF Nos. 45, 47).

- Black deliberately kept Mr. Watkins in handcuffs that she knew were excessively tight and inflicting injuries on him for over two hours. Aplt.App.-2-181 (OSUMF Nos. 53-54).

The District Court had previously concluded that Mr. Watkins stated a claim for excessive force against all of the Appellees (including the denial of qualified

immunity) based on the above facts – facts also proven by the evidence at the summary judgment stage. *See* Aplt.App.-1-213, Aplt.App.-2-4, 23, 158. The result should have been no different at the summary judgment stage. However, while recognizing that Mr. Watkins pointed to evidence showing that he suffered "unnecessary and severe pain, bruising, and lingering damage to at least his finger" because of the Appellees' excessive force, the District Court concluded without analysis that Mr. Watkins failed to point to injuries sufficient to sustain an excessive force claim. Aplt.App.-3-228. The District Court erred.

In *Fisher v. City of Las Cruces*, 584 F.3d 888 (10th Cir. 2009), the Tenth Circuit denied qualified immunity on a summary judgment motion when the facts viewed in the light most favorable to the plaintiff showed that police officers handcuffed the plaintiff behind his back despite knowing he had obvious gunshot wounds to his bicep and stomach, the plaintiff pleaded with the officers not to handcuff him behind his back to avoid exacerbating the injuries, and an officer nevertheless placed a knee in his back to leverage the plaintiff's arms and handcuff him behind his back. 584 F.3d at 900. The plaintiff's evidence showed this manner of handcuffing caused him to "endure excruciating pain" and exacerbated his injuries. *Id.*

The Tenth Circuit emphasized in *Fisher* that a plaintiff need not show "proof of physical injury manifested by visible cuts, bruises, abrasions or scars" to

establish a greater than *de minimis* injury. *Id.* at 898-99. This court explained:

> [I]n excessive force cases proof of *physical* injury manifested by visible cuts, bruises, abrasions or scars, is not an essential element. Rather the interests protected by the Fourth Amendment are not confined to the right to be secure against physical harm; they include liberty, property, and privacy interests--a person's sense of security and individual dignity. We thus have consistently continued to reject a bright-line rule requiring plaintiffs to demonstrate *physical* as opposed to other injury when bringing excessive force claims. What we do require, though, is actual harm whether it be physical or emotional.

*Fisher v. City of Las Cruces*, 584 F.3d 888, 897-98 (10th Cir. 2009) (internal

citations and quotation marks omitted) (alterations in original).

Here, Mr. Watkins suffered actual physical and emotional injury from force

that was *more substantial* than the force officers used in *Fisher*. As mentioned, his

physical injuries included unnecessary and severe pain, bruising around his wrists

that lasted for over a week, and lingering damage to at least his finger.

Additionally, Mr. Watkins' sheer terror stemming from the Appellees' excessively

forceful violation of his privacy and dignitary interests is palpable on BWC camera

footage as Appellees go hands on with him and his towel falls off, leaving him

naked and exposed to strangers who have surreptitiously invaded his home. Thus,

"this is not a case where an uninjured suspect claims the arresting officer beat him

up"; rather, Mr. Watkins has presented significant proof that "he was injured at

some point" during his interaction with Appellees. *Grass v. Johnson*, 322 F. App'x

596, 590 (10th Cir. 2009). As such, a reasonable jury could find that Appellees are

all liable for subjecting Mr. Watkins to excessive force.

### A.   <u>No Appellee can receive qualified immunity from Mr. Watkins' excessive force claim.</u>

The individual Appellees all violated clearly established law about which a reasonable law enforcement officer would have known. By November 2018, it was clearly established that "*Graham* establishes that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest." *Casey v. City of Federal Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007). This principle alone supplies a sufficient basis for holding all the individuals liable for excessive force under the circumstances.[14] Moreover, Nichols choked Mr. Watkins even though he was doing nothing wrong at the time, in violation of clear Tenth Circuit precedent. *See Dixon v. Richer*, 922 F.2d 1456, 1463 (10th Cir. 1991) ("While it is reasonable to frisk a detainee suspected of carrying a weapon, it is not reasonable to hit him in the stomach with a flashlight, or choke and beat him, solely on the basis of that suspicion.") (internal citation omitted); *see also McCoy v. Meyers*, 887 F.3d 1034, 1051 (10th Cir. 2018).

---

[14] Akin to the officers who acted unreasonably by refusing to explain why they were arresting the plaintiff in *Casey*, the Appellees also refused to explain why they were in Mr. Watkins's home and did not give him a chance to comply with commands. *See* 509 F.3d at 1282; *see also Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665 (10th Cir. 2010) (lack of verbal commands before use of force can be factor in rendering such use of force unreasonable).

Throwing Mr. Watkins down very hard to the ground, especially face-first, as at least Nichols and Wunderlich did here, violated clearly established law as well. The Tenth Circuit has held that the "right to be free from a forceful takedown was clearly established under *Graham*." *Morris v. Noe*, 672 F.3d 1185, 1198 (10th Cir. 2012); *see also Becker v. Bateman*, 709 F.3d 1019, 1025-26 (10th Cir. 2013) (holding that a jury could find an officer's act of throwing the plaintiff to the ground was objectively unreasonable, and thus excessive, where all three *Graham* factors were met). In the Tenth Circuit, this holds true "even where [the plaintiff] exercised some resistance." *Long v. Fulmer*, 545 F. App'x 757, 761 (10th Cir. 2013); *see also Cook v. Peters*, 604 F. App'x 663, 667, 669 (10th Cir. 2015) (rejecting a qualified immunity defense where defendant security guard used a forceful takedown on a teenager for misdemeanor breach of the peace, and plaintiff did not carry a weapon or threaten anyone, but he did move away from the defendant); *Casey*, 509 F.3d at 1282-84 (holding that an officer's excessive force violated clearly established law where the officer jumped on a nonviolent misdemeanant after he moved his arm and started to walk away from the officer's arm-lock). Thus, in the Tenth Circuit, engaging in minimal resistance, such as moving away from an officer, does not justify a forceful takedown, let alone the choking, body slamming, and other inflictions of force on Mr. Watkins that occurred here.

Wunderlich's decision to crush Mr. Watkins under his body weight even though he was not resisting at the time violated clearly established law too. *See Lynch v. Bd. of Cty. Comm'rs*, 786 F. App'x 774, 778-80, 782 (10th Cir. 2019) (holding that a reasonable jury could find that officers used excessive force by continuing to apply physical pressure to a suspect who had engaged in significant criminal conduct, was high on meth, had punched an officer in the face, and was actively resisting arrest, but who, because his limbs were restrained, did not pose an immediate threat to the safety of officers or others, nor could he possibly flee); *Walton v. Gomez (In re Estate of Booker)*, 745 F.3d 405, 414, 24 (10th Cir. 2014) (holding that a deputy violated clearly established law by applying most of his bodyweight to Mr. Booker's back for three minutes after he was handcuffed and lying on the ground and while other deputies applied other forms of force).

Additionally, at least Appellees Nichols and Blacks' personal participation in the prolonged, excessively tight handcuffing of Mr. Watkins (which inflicted pain and injuries on him) violated clearly established Fourth Amendment law. *See Rettele*, 550 U.S. at 614 (2007); *Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007) (unduly tight handcuffing can constitute excessive force where "a plaintiff alleges some actual injury from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight[]"). Further, "because the Appellees here engaged in a

group effort, a reasonable jury could find them liable for any underlying finding of excessive force." *In re Estate of Booker*, 745 F.3d at 422. Finally, the failure of any Appellee to intervene to stop their Co-Appellees excessive use of force as described herein supplies a basis for holding them liable under clearly established law, as they could have prevented or stopped the force but did not. *Id*. at 422-23.

## **CONCLUSION**

The District Court's order granting summary judgment to Appellees on Appellant's unlawful entry/search and excessive claims under the Fourth Amendment should be reversed, the District Court's entry of judgment in favor of Appellees should be vacated, and this matter should be remanded to the District Court for further proceedings consistent with this Court's opinion.

DATED this 27th day of December 2022.

KILLMER, LANE & NEWMAN, LLP

*/s/ Michael Fairhurst*
David A. Lane
Michael Fairhurst
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000
(303) 571-1001 facsimile
dlane@kln-law.com
mfairhurst@kln-law.com

ATTORNEYS FOR PLAINTIFF-APPELLANT

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is desired in this appeal because it will assist the appellate court in determining how the District Court acted as the factfinder and misinterpreted and misapplied the law in granting summary judgment. Oral argument will likely be necessary to allow counsel to assist the court regarding factual and legal questions arising from the record before the District Court.

<u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains **12,404** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Local Rule 32.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: December 27, 2022.

KILLMER, LANE & NEWMAN, LLP

*s/ Michael Fairhurst*

_____
Michael Fairhurst
*Counsel for Plaintiff-Appellant*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 27 day of December 2022, I filed this **PLAINTIFF-APPELLANT'S OPENING BRIEF** via CM/ECF which will generate a Notice of Electronic Filing to the following:

Kelly Dunnaway
Amy Edwards
Office of the Douglas County Attorney
100 Third St.
Castle Rock, CO 80104
kdunnawa@douglas.co.us
aedwards@douglas.co.us

*s/ Michael Fairhurst*
Michael Fairhurst
Killmer Lane & Newman, LLP

ADDENDUM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore

Civil Action No. 20-cv-01172-RM-MEH

BRYCE WATKINS,

     Plaintiff,

v.

BRIAN WUNDERLICH, in his individual capacity,
KEVIN NICHOLS, in his individual capacity, and
TAMMY BLACK n/k/a Tammy Bozarth, in her individual capacity,

     Defendants.

---

## ORDER

---

     This lawsuit brought under 42 U.S.C. § 1983 is before the Court on Defendants' Motion for Summary Judgment. (ECF No. 20.) The Motion has been fully briefed. (ECF Nos. 23, 28.) For the reasons below, the Motion is granted.

## I.    BACKGROUND

     The following facts are not disputed for purposes of the Motion. On the evening of April 28, 2018, Plaintiff's wife called 911 and reported an incident of domestic violence that had occurred that morning at the home she jointly owned with Plaintiff. (ECF No. 87, ¶¶ 1, 2.) Plaintiff's wife reported that Plaintiff had tried to strangle her, and that she believed he might try to kill her. (*Id.* at ¶¶ 6, 7.) The next morning, she called 911 again to report that Plaintiff had returned home for the first time since the incident. (*Id.* at ¶ 10.) Defendants Nichols and Black, Douglas County Sheriff's Office deputies, and Defendant Wunderlich, a sergeant, responded to the call. (*Id.* at ¶¶ 11, 21.)

Defendant Nichols met with Plaintiff's wife at a park around the corner from the home, where she reported that she did not feel safe with Plaintiff. (*Id.* at ¶¶ 11, 12.) While there, Plaintiff's wife received a call from Plaintiff on her cell phone, and she handed the phone to Defendant Nichols, who spoke with Plaintiff for about thirty seconds. (*Id.* at ¶ 14.) Defendant Nichols asked Plaintiff to come to the front door and speak with him, but Plaintiff refused and told Defendant Nichols that the police could not enter his home. (*Id.* at ¶¶ 15, 16; ECF No. 86 at 1.) Defendant Nichols reported over the radio to the other officers that Plaintiff was refusing to come to the door. (ECF No. 87, ¶ 17.) Before heading over to the home, Defendant Nichols asked Plaintiff's wife for the code to open the home's garage. (*Id.* at ¶ 18.) She provided the code, explained how to enter it, and added that it could also be used for the front door. (*Id.* at ¶ 19.)

At the home, Defendant Nichols used the code to open the garage door, and he and Defendant Black entered the garage. (*Id.* at ¶ 22.) Defendant Wunderlich then asked Defendant Nichols if Plaintiff's wife had explicitly given them permission to enter the home, and Defendant Nichols acknowledged that she had not. (*Id.* at ¶ 23.) Defendant Nichols then returned to the park, where he received explicit permission from Plaintiff's wife for the officers to go into the home. (*Id.* at ¶ 25.) Defendant Nichols relayed the information to the other officers, and moments later they entered the living area of the home, announcing they were from the sheriff's office. (*Id.* at ¶¶ 26, 29.) From a different location in the home, Plaintiff responded by stating, "Excuse me. I'm actually getting dressed right now." (*Id.* at ¶ 31.) Defendants encountered Plaintiff when he was on the stairs above them, shirtless and with a towel wrapped around his waist. (*Id.* at ¶¶ 34, 35.) Defendant Nichols repeatedly commanded Plaintiff to come down the stairs, but he remained on the landing, asking what was going on and stating, "You're in my

2

house."  (*Id.* at ¶¶ 36, 37.)  Defendant Nichols responded, "Your wife gave us permission."  (*Id.* at ¶ 37.)

Plaintiff then began to walk down the stairs, stating, "I did not do anything."  (*Id.* at ¶ 39.)  As Defendant Nichols reached for one of Plaintiff's arms, he stepped back from the officers while still facing them and retreated up the stairs.  (*Id.* at ¶¶ 40, 41.)  A struggle ensued, but the officers apprehended Plaintiff on the stairs and placed him in handcuffs in about thirty seconds.  (*Id.* at ¶¶ 42-47.)  Defendant Nichols advised Plaintiff he was being arrested for "second degree assault, domestic violence."  (*Id.* at 47.)  Defendant Wunderlich asked Plaintiff where his clothes were and for permission to bring him some clothing, which Plaintiff agreed to. (*Id.* at ¶ 49.)  After Defendant Nichols helped Plaintiff into his pants, Plaintiff was escorted out the front door and into a patrol car.  (*Id.* at ¶¶ 50, 51.)

While in the car, Plaintiff was examined by medical personnel.  (*Id.* at ¶ 52.)  He remained in handcuffs as he was transported to the jail and underwent the booking process.  (*Id.* at ¶ 53.)  Plaintiff later testified that he experienced some bruising around his wrists from the handcuffs.  (*Id.* at ¶ 54.)  He was charged with a felony for the domestic assault on his wife.  (*Id.* at ¶ 55.)

In their Motion, Defendants contend they are entitled to qualified immunity on Plaintiff's remaining claims: an unlawful entry or search claim against Defendants Nichols and Black and an excessive force claim against all Defendants.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Gutteridge v.*

*Oklahoma*, 878 F.3d 1233, 1238 (10th Cir. 2018).  Applying this standard requires viewing the facts in the light most favorable to the nonmoving party and resolving all factual disputes and reasonable inferences in his favor.  *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013).  However, "if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue."  *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1143-44 (10th Cir. 2013).  "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted).  A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## B.     Qualified Immunity

Qualified immunity shields individual defendants named in § 1983 actions from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Gutteridge*, 878 F.3d at 1238; *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014).  "Once the qualified immunity defense is asserted, the plaintiff bears a heavy two-part burden to show, first, the defendant's actions violated a constitutional or statutory right, and, second, that the right was clearly established at the time of the conduct at issue."  *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (quotation omitted).  "If, and only if, the plaintiff meets this two-part test does a defendant then bear the burden of the movant for summary judgment—showing that there are no genuine issues

of material fact that he or she is entitled to judgment as a matter of law." *Gutteridge*, 878 F.3d at 1238 (quotation omitted).

## III.    ANALYSIS

Defendants assert that their entry into the home and arrest of Plaintiff did not violate his clearly established Fourth Amendment rights because his wife consented to the entry and the force used to effect the arrest was not clearly unreasonable.  The Court agrees with both assertions.

### A.    Unlawful Entry or Search Claim

"Voluntary consent is a longstanding exception to the general requirement that law enforcement officers must have a warrant to enter a person's home." *United States v. Guillen*, 995 F.3d 1095, 1103 (10th Cir. 2021).  "The exception applies when the government proves (1) the officers received either express or implied consent and (2) that consent was freely and voluntarily given." *Id.*

Plaintiff first argues that a jury question exists as to whether Defendants Nichols and Black had legal justification for their initial entry into Plaintiff's garage.  But based on the undisputed facts, these Defendants could have reasonably believed Plaintiff's wife impliedly consented to the entry by providing the code to open the home's front door and garage. Although consent must be clear, it need not be verbal.  *See United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007).  Consent may be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer.  *Id.* at 789-90.  The fact that Defendants subsequently obtained—seemingly out of an abundance of caution—Plaintiff's wife's express consent to enter the home does not render ambiguous or invalid the implied consent she gave earlier by providing Defendant with the code and explaining

how to use it.  Plaintiff has adduced no evidence that this implied consent was not "unequivocal and specific" (ECF No. 72 at 6), and the Court finds it was sufficient to provide reasonable officers with a basis for believing they had a lawful basis to enter the home.

The Court also rejects Plaintiff's contention that either the implied or express consent given by his wife was invalidated by any statement he made either to Defendant Nichols over the phone or to Defendants directly once they were inside the home.  Plaintiff's reliance on *Georgia v. Randolph*, 547 U.S. 1515, 1526 (2006), in this context is misplaced.  There, the officer asked the defendant's wife for permission to search the house after she told him there were items of drug evidence in the home, and the defendant had unequivocally refused the officer's request for *his* permission to conduct a search.  *Id.* at 1519.  The *Randolph* Court held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of the consent given to the police by another resident."  *Id.* at 1526.  But *Randolph* is distinguishable from this case for multiple reasons—one if which is because the officers were not conducting a search but effecting an arrest.  "[W]hen the police may enter without committing a trespass, and the police may enter to search for evidence" are "two different issues."  *Id.* at 1525.

More importantly, however, the *Randolph* Court repeatedly emphasized that the person objecting to the search was standing at the door.  *See id.* at 1522-23 ("[I]t is fair to say that a caller standing at the door of shared premises would have no confidence that one occupant's invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, 'stay out.'"); *id.* at 1526 ("The undoubted right of the police to enter in order to protect a victim, however, has nothing to do with the question in this case, whether a search with the consent of one co-tenant is good against another, standing at the door and expressly refusing consent."); *id.*

6

at 1527 ("[W]e have to admit that we are drawing a fine line; if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search.").  As noted in *Fernandez v. California*, 571 U.S. 292, 303-04 (2014), expanding *Randolph* by allowing a previously made objection to remain effective even when the objector is not standing at the door would create numerous "practical complications that *Randolph* sought to avoid."  *See id.* at 306 ("If *Randolph* is taken at its word—that it applies only when the objector is standing in the door saying 'stay out' when officers propose to make a consent search—all of these problems disappear.").

Here, it is undisputed that Plaintiff was not standing at any door Defendants opened in the course of arresting him.  Based on the rationales behind *Randolph* and *Fernandez*, the Court declines Plaintiff's invitation to apply Randolph "to all circumstances when the expressly objecting occupant is physically present in their home."  (ECF No. 72 at 13.)  The Court also finds that no statements or conduct tending to show that Plaintiff did not want the officers in his home—made either beforehand or during his arrest—overrode or revoked the consent given by his wife.  *Cf. Manzanares v. Higdon*, 575 F.3d 1135, 1146 (10th Cir. 2009) (concluding officer was compelled to leave after consent was withdrawn by the person who initially granted it); *see also Williams v. People*, 455 P.3d 347, 348 (Colo. 2019) (concluding that husband's subsequent objection to search, after the officers had already entered his home and were in the process of taking possession of drugs and paraphernalia, could not vitiate his wife's previously given consent).  Because Defendants had valid consent to enter the home, there is no genuine issue as to whether the entry by Defendants Nichols and Black violated his Fourth Amendment rights, and they are entitled to qualified immunity on this claim.  At the very least, the

application of *Randolph* to the facts of this case is not clearly established. This provides a further basis for concluding that qualified immunity applies.

**B.      Excessive Force Claim**

"[T]he right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Determining whether the force used to effectuate a seizure is reasonable under the Fourth Amendment "requires careful consideration of the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The "reasonableness" of a particular use of force is judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, and not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. *Id.*

Here, Plaintiff admits he "retreated a handful of steps" despite repeated commands to come down the stairs. (ECF No. 72 at 16.) Moreover, he was being arrested for a violent felony based on the allegation he had attempted to strangle his wife the day before. Nonetheless, he attempts to salvage his excessive force claim by contending that, in the relatively brief time it took for the officers to arrest him, they "all beat him"; "Defendant Nichols grabbed and tackled him, throwing [him] down hard to the ground with his back pointed towards the stairs"; Defendant Nichols "intentionally choked him"; the officers "threw [him] down to the ground very hard (again), this time face-first"; and Defendant Wunderlich "crushed [his] body while he was lying face-down on his stairs." (ECF No. 72 at 17.) He further contends he was "excessively tightly handcuffed" for over two hours. (*Id.*) Tellingly, however, Plaintiff does

point to any evidence of an actual injury that is not de minimis resulting from Defendants'

conduct.  "[A] claim of excessive force requires some actual injury that is not de minimis, be it

physical or emotional."  *Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007).  In his

Response, Plaintiff contends that his "actual injury here included but is not limited to

unnecessary and severe pain, bruising, and lingering damage to at least his finger."  (ECF No. 72

at 20 n.9.)  The Court finds Plaintiff's allegations and evidence are insufficient to establish that

Defendants exceeded what was reasonable to effectuate his arrest.  In the absence of a

constitutional violation, Defendants are entitled to qualified immunity on this claim as well.

## IV.   CONCLUSION

Therefore, the Motion (ECF No. 66) is GRANTED, and the Clerk is directed to CLOSE

this case.

DATED this 22nd day of September, 2022.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-01172-RM-MEH

BRYCE WATKINS,

     Plaintiff,

v.

BRIAN WUNDERLICH, in his individual capacity,
KEVIN NICHOLS, in his individual capacity, and
TAMMY BLACK, n/k/a Tammy Bozarth, in her individual capacity,

     Defendants.

---

**FINAL JUDGMENT**

---

     In accordance with the orders filed during the pendency of this case, and

pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

     Pursuant to the Order (Doc. 89) by Judge Raymond P. Moore entered on

September 22, 2022, it is

     ORDERED that summary judgment is entered in favor of the defendants and

against the plaintiff.   It is

     FURTHER ORDERED that this case is closed.

     Dated this 22nd day of September, 2022.

                  FOR THE COURT:
                  JEFFREY P. COLWELL


                  By:   s/C. Pearson, Deputy Clerk