No. 22-1358

---

**In the United States Court of Appeals
For the Tenth Circuit**

---

BRYCE WATKINS,

*Plaintiff-Appellant,*

v.

BRIAN WUNDERLICH, KEVIN NICHOLS, TAMMY BLACK,

*Defendants-Appellees.*

---

**On Appeal from the United States District Court for the
District of Colorado**
Civil Action No. 1:20-cv-01172-RM-MEH
The Honorable Judge Raymond Moore

---

**DEFENDANTS'-APPELLEES' CORRECTED RESPONSE BRIEF**

---

Kelly Dunnaway (kdunnaway@douglas.co.us)
Douglas County Attorney's Office
100 Third Street, Castle Rock, CO 80104
Telephone: (303) 660-7414; Facsimile: (303) 484-0399

ATTORNEYS FOR DEFENDANTS/APPELLEES:
BRIAN WUNDERLICH, KEVIN NICHOLS, TAMMY BLACK

**ORAL ARGUMENT IS NOT REQUESTED**

# TABLE OF CONTENTS

<u>Page</u>

TABLE OF CONTENTS ............................................................................... ii

TABLE OF AUTHORITIES ......................................................................... iv

STATEMENT OF RELATED CASES ........................................................... 1

JURISDICTIONAL STATEMENT ............................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................ 1

STATEMENT OF THE CASE ...................................................................... 1

    I.      Facts Relevant To The Issues Submitted For Review ......................... 3

    II.     Relevant Procedural History ...................................................... 8

    III.   Rulings Presented For Review ..................................................... 9

SUMMARY OF THE ARGUMENT ............................................................... 9

ARGUMENT ............................................................................................ 10

    I.      STANDARD OF REVIEW ................................................................ 10

    II.     THE DISTRICT COURT CORRECTLY CONCLUDED
          THAT APPELLEES ARE ENTITLED TO QUALIFIED
          IMMUNITY ................................................................................ 11

         A.    Deputies Nichols' and Bozarth's Entry Into The Home
              Did Not Violate Clearly Established Law ................................ 12

              1.   Defendants/Appellees Had Ms. Watkins' Consent To
                   Enter the Home ................................................................ 12

              2.   *Randolph* Does Not Clearly Extend To Consent For
                   Entry In Aid Of Victims of Domestic Violence ..................... 14

        3.   Subsequent Precedent Has Not Clearly Extended *Randolph* To The Circumstances Of Appellant's Arrest ........................................................................ 17

   B.   Defendants' Level Of Force Used To Handcuff and Transport Appellant Did Not Violate Clearly Established Law ................................................................ 22

        1.   None of the Defendants' Individual Or Collective Actions Violated Clearly Established Law While Securing Appellant in Custody..................................... 22

            a.   Deputy Nichols Did Not Violate Clearly Established Law With the Level Of Force He Employed Securing Appellant Into Custody. .............. 25

            b.   Sergeant Wunderlich Did Not Violate Clearly Established Law With The Level Of Force He Employed Securing Appellant Into Custody. ............. 26

            c.   Deputy Bozarth Did Not Violate Clearly Established Law With the Level Of Force He Employed Securing Appellant Into Custody. .............. 27

        2.   The Manner of Appellant's Handcuffing Did Not Rise To The Level Of Constitutional Violation Or Violate Clearly Established Law.................................. 27

CONCLUSION ........................................................................ 30

TENTH CIRCUIT RULE 25.5 CERTIFICATION................................. 31

CERTIFICATE OF COMPLIANCE WITH APPLICABLE TYPE VOLUME LIMITS ................................................................................ 32

STATEMENT REGARDING ORAL ARGUMENT ............................. 33

CERTIFICATE OF SERVICE .................................................... 34

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                      <u>Page(s)</u>

*Cortez v. McCauley,*
   478 F.3d 1108 (10th Cir. 2007)...............................................................10

*D.C. v. Wesby*,
   138 S.Ct. 577 (2018) ...............................................................................11

*Donahue v. Wihongi,*
   948 F.3d 1177 (10th Cir. 2020)...............................................................27

*Edwards v. City of Muskogee, Oklahoma*, 841 Fed. Appx. 79 (10th Cir. 2021).....23

*Fernandez v. California*,
   571 U.S. 292 (2014) ........................................................... 12, 18, 19, 20, 21, 22

*Fisher v. City of Las Cruces*,
   584 F.3d 888 (10th Cir. 2009)................................................................28

*Georgia v. Randolph,* 547 U.S. 103 (2006) …. 1, 2, 9, 10, 14, 16, 17, 18, 19, 20, 21, 22

*Graham v. Connor,*
   490 U.S. 386 (1989) ...................................................................... 10, 23

*Hawker v. Sandy City Corp.*,
   591 F.App'x 669 (10th Cir. 2014) .......................................................23

*Kisela v. Hughes*,
   138 S.Ct. 1148 (2018) .................................................................... 12, 23

*Lundstrom v. Romero*,
   616 F.3d 1108 (10th Cir. 2010)..............................................................23

*Mullenix v. Luna*,
   136 S.Ct. 305 (2015) ..............................................................................12

*Pauly v. White*,
  874 F.3d 1197 (10th Cir. 2019)...............................................................11

*Schneckloth v. Bustamonte*,
  412 U.S. 218 (1973)............................................................................12

*Scott v. City of Albuquerque,* 711 Fed.Appx. 871(10th Cir. 2017) ............. 28, 29, 30

*Starrett v. City of Lander*,
  699 F.App'x 805 (10th Cir. 2017) ................................................. 22, 25

*U.S. v. Guerrero*,
  472 F.3d 784 (10th Cir. 2007).............................................................13

*U.S. v. Guillen*,
  995 F.3d 1095 (10th Cir. 2021)....................................................... 12, 13

*U.S. v. Woodman*,
  508 F.App'x 837 (10th Cir. 2013) .................................................. 12, 13

*White v. Pauly*,
  137 S.Ct. 548 (2017) ........................................................................22

*Woodman v. Runyon,*
  132 F.3d 1330 (10th Cir. 1997)............................................................10

*Zartner v. Miller*,
  760 F.App'x 558 (10th Cir. 2019) ......................................................28

## Statutes

28 U.S.C. §1291 ...................................................................................1
42 U.S.C. §1983 ............................................................................... 8, 11
U.S. Const. amend. IV .........................................................................12

## Other Authorities

4 W. LaFave, Search and Seizure § 8.3(d) (6th ed. 2020).......................17

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

## JURISDICTIONAL STATEMENT

Jurisdiction is proper under 28 U.S.C. §1291.

## ISSUES PRESENTED

I.    Whether the District Court properly dismissed Appellant's unlawful entry/search claim.

II.   Whether the District Court properly dismissed Appellant's excessive force claim

## STATEMENT OF THE CASE

Preliminarily, it should be noted that the crux of the issue, as framed by the trial court, is quite simple; that is, whether the Supreme Court's holding in *Georgia* v. *Randolph,*[1] which addressed a warrantless entry to search for drugs, applies to a warrantless entry to effectuate a domestic violence arrest—a question that is not settled in the Tenth Circuit.

Appellant raises numerous factual arguments, including seven pages of "Additional Material Facts" (Op. Brief, pages 15-22), but the only fact that was material to the trial court's decision was Appellant's assertion that he told Deputy Nichols, over his wife's cell phone, that the Deputies could not enter his house.

---

[1]  547 U.S. 103 (2006)

1

(Op. Brief, page 2).    To be clear, the Deputies absolutely deny that assertion for at least two obvious reasons:

(1) Such a statement would have been a non-sequitur.   The Body Worn Camera ("BWC") footage submitted to the trial court (Aplt. App.1-0063 Exhibit 1 to Defendants' Motion to Dismiss) at [5:50-6:25]) includes the conversation between Mr. Watkins and Deputy Nichols wherein the statement is alleged to have been made. Although Mr. Watkins' portion of the conversation is largely inaudible, the topic did not come up, nor was there time for such a conversation before Mr. Watkins hung up on Deputy Nichols and, in the context of the conversation that was captured, such a statement would have been out of context; and

(2) If such a statement had actually been made, it surely would have been raised to the state court during the criminal proceeding when the legality of the subsequent search was   argued.   (Op. Br., page 22; Aplt. App.-2-102).    But this new claim was never raised in the criminal case.    It simply makes no sense that Mr. Watkins would keep such a statement to himself when his liberty interest was at stake, and instead save it for a subsequent civil action.

Nonetheless, realizing that this is a fact question that would not likely be decided on Summary Judgment, the Deputies conceded, for the purposes of the motion, that such a statement *had* been made, and sought a ruling on the *Randolph* issue under that assumption.    [Aplt.App.-2-0043, n. 3].    This concession, for purposes of the Order under review, renders much of Appellant's factual argument unnecessary. For example, Appellant's argument--that the Deputies' "surreptitious" entry into the garage indicated that they were aware that Mr. Watkins did not want them in his house (Op.Br. p. 19)--has no bearing on the trial court's holding that, "no statement or conduct tending to show that Plaintiff did not want the officers in

his home—made either beforehand or during his arrest—overrode or revoked the consent given by his wife."   (Order, Aplt.App.-3-0226).

In short, it simply makes no sense to continue arguing about whether the Deputies knew Appellant did not want them in the house when, for purposes of the relevant Motion for Summary Judgement, hence for purposes of the District Court Order, and hence for purposes of this appeal, the point is already conceded.

## I.     Facts Relevant To The Issues Submitted For Review

 On the evening of April 28, 2018, a woman identifying herself as Denise Watkins called 911 to report that she had been a victim of domestic violence at the hands of her then-husband, Appellant, Bryce Watkins.  (Aplt.App.-2-0062-66 and Aplt.App.-3-0166-169),  ¶¶ 2 and 3)[2] Ms. Watkins reported that the domestic violence incident had occurred at approximately 10:40 a.m. that day at their home at 14110 Pastel Lane, Parker, Colorado (the "Home").  (*Id.* ¶ 2.)  Ms. Watkins reported that Appellant had charged at her, thrown her to the ground and put his arms around her neck.  (*Id.* ¶ 3.)

Three officers (not part of this lawsuit) from the Douglas County Sheriff's Office ("DCSO") responded to the Home.  (*Id.* ¶ 5.)  Ms. Watkins reported to them, specifically to Deputy Friesen, that Appellant had tried to strangle her, that he had

---

[2] As stated above, the Deputies adamantly deny that this statement was made, but for purposes of their Motion for Summary Judgment, the Deputies conceded that Mr. Watkins told them not to come into the house. (Doc. 66, n. 3, Aplt.App.-2-0043)

restricted her airway when he had his arm around her neck during the domestic violence incident, that she had been "fighting for [her] life," and that she did not know if Bryce would attempt to kill her. (*Id.* ¶¶ 6, 7.) Deputy Friesen called Appellant from the Home and left a message informing him that he was investigating the disturbance between Appellant and his wife earlier that day, that he wanted to get Appellant's side of the story, and that he needed Appellant to call him back shortly or the case would be forwarded to detectives to seek a warrant for Appellant's arrest. (*Id.* ¶¶ 5, 8.) Appellant heard Deputy Friesen's message the next morning before he returned to the Home but he did not contact Deputy Friesen. (*Id.* ¶¶ 9.)

Shortly before 9:45 a.m. on April 29, 2018, Ms. Watkins again called 911 to report that Appellant had just returned to the Home for the first time since the domestic violence incident occurred. (*Id.* ¶ 10.) In response to Ms. Watkins' 911 call, DCSO Deputy Kevin Nichols met Ms. Watkins at a park around the corner from the Home. (Aplt.App.-2-0065 ¶ 11.) Ms. Watkins reported to Deputy Nichols that she did not feel safe with Appellant. (Aplt.App.-2-0066, ¶ 12.) She also informed Deputy Nichols that there was a baseball bat upstairs in the Home. (Aplt.App.-2-0066 ¶ 13.)

While Ms. Watkins was in the park with Deputy Nichols, she received a call on her cell phone from Appellant. (Aplt.App.-2-0066 and Aplt.App.-3-0164, ¶ 14.) Ms. Watkins handed her phone to Deputy Nichols, who spoke with Appellant

4

briefly. (*Id.*) During the call, Deputy Nichols asked Appellant to come down to the front of the Home and speak with them. (Aplt.App.-2-0067 ⁋ 15.) Deputy Nichols did not, however, mention anything about entering the Home. (*Id.*) Although Deputy Nichols never raised the subject, Appellant asserts in this lawsuit, for the first time, that he "probably" volunteered to Deputy Nichols that they could not come inside the Home. (Aplt.App.-2-0067 ⁋ 16.)

After the call, Deputy Nichols aired over his radio that he had spoken to Appellant who refused to come to the door and hung up on him. (*Id.* ⁋ 17.) Deputy Nichols asked Ms. Watkins for the code to the Home's garage door, and Ms. Watkins provided him with the code, explained how to enter it, and informed him the code was the same for the front door as well. (*Id.* ⁋⁋ 18, 19.) Ms. Watkins did so willingly, intending to express her permission for law enforcement to enter the Home. (Aplt.App.-2-0068 ⁋ 20.) Deputy Nichols then proceeded to the Home, where he met Deputy Bozarth and Sergeant Wunderlich. (Aplt.App.-2-0068 ⁋ 21.) Deputy Nichols subsequently entered the garage door code, which opened the garage door, and made his initial entry into the garage. Aplt.App.-2-0069 ⁋ 22.) Appellant was not at the door to the garage. (Aplt.App.-2-0070 ⁋ 28.)

While Deputy Nichols was in the garage, Sgt. Wunderlich asked whether Ms. Watkins had given her permission to enter the Home, and Nichols explained that she had not explicitly said they had permission, but she had supplied the

code.  (Aplt.App.-2-0069 and Aplt.App.-3-0168-169 ¶ 23.)  At Sergeant Wunderlich's direction, Deputy Nichols returned to the park, specifically asked Ms. Watkins if they had permission to enter, and confirmed that they had her permission—permission she believed she had already conveyed during their first meeting in the park.  (Aplt.App.-2-0069 and Aplt.App.-3-0168-169   PP 24, 25.)

Deputy Nichols returned to the Home, confirmed that Ms. Watkins had given her permission for them to enter, and made his way through the garage and into the living area of the Home, followed by Deputy Bozarth.  (Aplt.App.-2-0070 and Aplt.App.-2-0170 PP 26, 27, 29.)  Appellant was not at the doorway into the living area of the Home when they entered.  (*Id.* P30.)  Deputies Nichols and Bozarth called Appellant's name and announced they were with the Sheriff's Office.  (*Id.* P 29.)  Defendants subsequently located Appellant on a stairway leading from the first floor to the second floor, which gave Appellant a tactical advantage because he was above  Defendants.  (Aplt.App.-2-0074 and Aplt.App.-2-0173 P 34.)

While he was on the stairs, Appellant repeatedly spoke to Defendants, including stating multiple times, "what's going on" and "you're in my house."  (Aplt.App.-2-0073 and Aplt.App.-3-174-175 PP 36.)  Appellant did not, however, tell Defendants to stay out or that they had to leave.  (*Id.* PP 38, .)  Deputy Nichols told Appellant multiple times to come down the stairs, and Appellant eventually began to walk down from the landing to the bottom step, but when Deputy

Nichols reached for his arm, Appellant began to scramble back up the stairs, dodging Deputy Nichols' grasp.  (Aplt.App.-2-0072-73 and Aplt.App.-3-174-176  ⁋ 36, 39, 40, 41.)

Appellant continued to scramble up the stairs, followed by Deputy Nichols and Deputy Bozarth, but neither were able to secure him as he fled.  (*Id.* ⁋⁋ 41, 42, 43.)  Sergeant Wunderlich then climbed up the stairs and was able to secure Appellant and hold him on the stairs.  (*Id.* ⁋ 44.)  The pursuit up the stairs, from the time Appellant first dodged Deputy Nichols' reach to the time he was secured and no additional physical force was exerted, lasted approximately 32 seconds.  (*Id.* ⁋ 45.)  Over the course of those 32 seconds, Appellant continued to audibly yell.  (*Id.* ⁋ 46.)  Once Appellant was secured, Deputy Nichols handcuffed him and advised him he was being arrested for second degree assault, domestic violence.  (*Id.* ⁋ 47.)  Defendants assisted Appellant in getting dressed, and escorted him to a patrol vehicle.  (Aplt.App.-2-0076-77   and   Aplt.App.-3-179-180.   ⁋⁋   49,   50, 51.)  Appellant was examined by medical personnel and then transported by Deputy Bozarth to the Douglas County Jail on charges that included a felony for the domestic violence assault.  (*Id.* ⁋⁋ 52, 53, 55.)  Appellant remained handcuffed through booking, consistent with DCSO policy, and has testified that he suffered bruising as a result.  (*Id.* ⁋⁋ 53, 54.)

## II.    Relevant Procedural History

Once Appellant completed his court-ordered alcohol abuse and anger management courses imposed by the state court criminal proceeding (Aplt.App.-1-0046, n. 3), he sealed his criminal records and filed a federal civil rights lawsuit against Appellees on April 27, 2020. (Aplt.App.-1-18.) The District Court subsequently granted in part and denied in part Appellees' motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6). (Aplt.App.-1-213, Aplt.App.-2-4.) At the time the District Court ruled on Appellees' motion for summary judgment, Appellant had the following claims against Appellees pursuant to 42 U.S.C. 1983: (1) unlawful entry/search into Appellant's home against Nichols; (2) unlawful entry/search into Appellant's garage only against Black; and (3) excessive force against Nichols, Black, and Wunderlich. *Id*. The District Court, in its September 22, 2022 summary judgment order, held that no reasonable jury could conclude that any of the Appellees entered and searched Appellant's home illegally. The District Court further held that no Appellee subjected Appellant to excessive force inside his home. The District Court therefore granted Appellees' motion for summary judgment and dismissed all of Appellant's claims against all of the Appellees. *See* Aplt.App.-3-220.

## III.    Rulings Presented For Review

On appeal, Appellant challenges the District Court's September 22, 2022 Dismissal Order and entry of Final Judgment in favor of the County Defendants. (Aplt.App.-3-0220-0228)

## SUMMARY OF THE ARGUMENT

Appellant's argument about whether consent was given seems to be a red herring; rather, the argument should focus on whether that consent was effectively revoked.   It is undisputed that Ms. Watkins provided the garage code and instructions for entry to the Deputies that she had called to the Home.   This is, at the very least, implied consent.   The subsequent reaffirmation of implied consent with express consent was superfluous; that is, either way, as the District Court found, the Deputies had one co-owner's consent to enter the Home.

There is a question of fact pertaining to whether Appellant ever told the Deputies that they could not enter the Home.   On summary judgment, the Deputies could not argue that this fact was undisputed, so instead, they argued that it is immaterial; that is, Appellant's claimed "revocation" was ineffective because the *Randolph* rule, which allows one co-owner to revoke another co-owner's *consent to search*, has never been applied in any other context, and subsequent court decisions have cast serious doubt on whether it ever could.   Even the *Randolph* Court itself limited the application of its new rule, pointing out that, "when police may enter

9

without committing a trespass, and [when] the police may enter to search for evidence," are "two different questions." 547 U.S. 103, at 1525.

As the District Court ruled, "no statement or conduct tending to show that Plaintiff did not want the officers in his home—made either beforehand or during the arrest—overrode or revoked that consent." (Aplt. App.-3-0226, Order at p 7). As a fallback, the District Court went on to hold that, "[a]t the very least, the application of *Randolph* to the facts of this case is not clearly established," providing Qualified Immunity as a further basis for the dismissal.

Furthermore, once the right to arrest was established, "the right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor,* 490 U.S. 386, 396 (1989). The BWC footage shows the force used was reasonable. There was no hitting, striking, or Taser deployed -- only open-hand techniques. It is undisputed that Appellant was examined by medical after the arrest and that he had no "actual injury" that was not "de minimis." *See Cortez v. McCauley,* 478 F.3d 1108, 1129 (10th Cir. 2007).

**ARGUMENT**

## I.    STANDARD OF REVIEW.

A district court's grant of summary judgment is reviewed *de novo. Woodman v. Runyon,* 132 F.3d 1330 (10th Cir. 1997)

## II. THE DISTRICT COURT CORRECTLY CONCLUDED THAT APPELLEES ARE ENTITLED TO QUALIFIED IMMUNITY.

"Individual defendants named in a § 1983 action may raise a defense of qualified immunity[.]" *Pauly v. White*, 874 F.3d 1197, 1214 (10th Cir. 2019). Once a defendant raises the defense of qualified immunity, "the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Pauly*, 874 F.3d at 1214 (citations omitted).

Clearly established rights are those that have been defined with specificity:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be 'settled law,' which means it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority[.]' It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough *that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply*. Otherwise, the rule is not one that 'every reasonable official' would know.
>
> The 'clearly established' standard also requires that the legal principle *clearly prohibit the officer's conduct in the particular circumstances before him*. The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' *This requires a high 'degree of specificity.'*

*D.C. v. Wesby*, 138 S.Ct. 577, 589-90 (2018) (citations omitted) (emphasis added). "Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the

11

officer confronts." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (quoting *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015)).

    A.    Deputies Nichols' And Bozarth's Entry Into The Home Did Not Violate Clearly Established Law**.**

        1.   <u>Defendants Had Ms. Watkins' Consent To Enter The Home</u>.

The Fourth Amendment protects the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  If officers search a home without a warrant, the search is "presumptively unreasonable," and evidence obtained from such a search is inadmissible, subject only to a few carefully established exceptions. *U.S. v. White*, 508 F.App'x 837, 840 (10th Cir. 2013).  However, even in the search context, "certain categories of permissible warrantless searches have long been recognized." *Fernandez v. California*, 571 U.S. 292, 298 (2014).

Voluntary consent is one long-recognized exception. *See U.S. v. Guillen*, 995 F.3d 1095, 1101, 1103 (10th Cir. 2021) ("[v]oluntary consent is a longstanding exception to the general requirement that law enforcement officers must have a warrant to enter a person's home").  "'Consent searches are part of the standard investigatory techniques of law enforcement agencies' and are 'a constitutionally permissible and wholly legitimate aspect of effective police activity.'" *Fernandez*, 571 U.S. at 298 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 228, 231-32 (1973)).  "Consent may be obtained from the individual whose property is searched,

or in certain instances, from a third party who possesses either actual authority or apparent authority to consent to the search." *White*, 508 F.App'x at 840.

Consent may be express or implied, *Guillen*, 995 F.3d at 1101, and "[i]mplied consent to enter a home is no less valid than explicit consent," *White*, 508 F.App'x at 840. "[C]onsent must be clear, but it need not be verbal. Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer." *U.S. v. Guerrero*, 472 F.3d 784, 789-90 (10th Cir. 2007); *see also Guillen*, 995 F.3d at 1104 (finding trial court did not clearly err in concluding that the defendant impliedly consented to law enforcement entering his home by stepping away from the door, allowing the officers to enter).

Implied consent may be nuanced, but in this case it was plain. The District Court reviewed the BWC footage of Ms. Watkins, a co-owner of the home, engaged in conduct that a reasonable officer would perceive as providing consent by giving Deputy Nichols the access codes to the garage and front door of the Home and specifically explaining how to enter the code on the keypads. (Aplt.App.-2-0067-0068, ⁋ 18, 19.) Most critically, though, Ms. Watkins *agrees* that she intended to consent to the Deputies' entry by providing the code and describing how to use it to gain entry into the Home. (Aplt.App.-2-0067, ⁋ 20.) There is no legitimate dispute

13

that Defendants had Ms. Watkins' valid consent to enter the Home before they opened the garage door.

### 2. *Randolph* Does Not Clearly Extend To Consent For Entry In *Aid* Of Victims Of Domestic Violence.

In *Georgia v. Randolph*, the Supreme Court reaffirmed:

> The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained.

547 U.S. 103, 106 (2006). The Court then went on to address the lawfulness of "such an evidentiary seizure . . . with the permission of one occupant when the other, who later seeks to suppress the evidence, is present at the scene and expressly refuses to consent." *Id.* The Court held that, "*in the circumstances here at issue*, a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him." *Id.* (emphasis added).

The "circumstances . . . at issue" in *Randolph* did not involve domestic violence. Rather, *Randolph* concerned spouses that had separated when the wife took the couple's son and went to stay with her parents in Canada. *Id.* A little over a month later, the wife returned to the marital home with her son. *Id.* Shortly after returning, the wife contacted the police to complain that her husband had taken the child after a domestic dispute. *Id.* at 107. The dispute between the spouses is not described, nor is it identified as a basis for the wife's complaint. *Id.* When the

14

police arrived at the home, the wife reported that the husband used cocaine. *Id.* The husband arrived at the home shortly after the police arrived, stated that he had taken their son to a neighbor's home out of fear that the wife would take him out of the country again, denied using cocaine, and asserted that the wife abused drugs and alcohol. *Id.*

One of the officers took the wife to get the son, and when they returned to the home, the wife informed the officer that there was evidence of drugs in the home. *Id.* The officer asked the husband for permission to search the house, and the husband "unequivocally refused." *Id.* The officer then turned to the wife and requested permission to search the home, which she granted, and the wife led the officer to the husband's bedroom, where the officer found and seized a straw with what appeared to be cocaine on it. *Id.* The officer went to his vehicle to obtain an evidence bag, and when he returned to the home, the wife rescinded her consent. *Id.* The officers subsequently obtained a warrant and seized additional evidence of drug use, and the husband was later indicted for possession of cocaine. *Id.* Under those facts, the Court concluded that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Id.*

In reaching its decision, the *Randolph* Court expressly declined to address "the capacity of the police to protect domestic victims." The *Randolph* Court clarified a limitation of its holding, explaining that "[n]o question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence[.]" In this respect, the Court was careful to limit its holding to cases involving searches for evidence. *See id.* at 118-19 ("The undoubted right of the police to enter in order to protect a victim, however, has nothing to do with the question in this case, whether a *search* with the consent of one co-tenant is good against another, standing at the door and expressly refusing consent.") (emphasis added). Indeed, the majority's decision chastises the dissent for failing "to distinguish two different issues: when the police may enter without committing a trespass, and when the police may enter to search for evidence." *Id.* The *Randolph* Court only addressed the *latter*, distinguishing authority relied on in the dissent by explaining that "[n]one of the cases cited by the dissent support its improbable view that recognizing limits *on merely evidentiary searches* would compromise the capacity to protect a fearful occupant." *Id.* at 119 (emphasis added).

The *Randolph* Court's decision to carve out the issue of consent to enter in aid of a victim of domestic violence was premised on the very rationale that underlies its decision. In considering the significance of a co-tenant who is physically present

16

in the doorway and objects to law enforcement entering to conduct a search for evidence, the Court looked to societal expectations, reasoning that two occupants having equal claim of right to their common residence should resolve disputes as to the use of the residence through voluntary accommodation rather than through appeals to law enforcement. *Randolph*, 547 U.S. at 113-14. In circumstances involving domestic violence, however, the aggressor and the victim are not necessarily viewed by society as having an equal claim of right:

> [I]t may be suggested that even when the two persons quite clearly have equal rights in the place, as where two individuals are sharing an apartment on an equal basis, there may nonetheless sometimes exist a basis for giving greater recognition to the interests of one over the other. There is much to be said for the proposition that where 'the defendant has victimized the third party . . . the emergency nature of the situation is such that the third-party consent should validate a warrantless search despite defendant's objections.'

4 W. LaFave, Search and Seizure § 8.3(d) (6th ed. 2020). Indeed, the *Randolph* Court relied on this apt assessment by Professor LaFave to conclude that in circumstances of domestic violence, "the question whether the police might lawfully enter *over objection* in order to provide any protection that might be reasonable *is easily answered yes*." *Randolph*, 547 U.S. at 118 (emphasis added).

### 3. Subsequent Precedent Has Not Clearly Extended *Randolph* To The Circumstances Of Appellant's Arrest.

Since *Randolph* was decided in 2006, neither the Supreme Court nor the Tenth Circuit have extended *Randolph* to clearly prohibit Appellees' entry into the Home

under the circumstances present in this case.  To the contrary, subsequent decisions have narrowed the applicability of *Randolph* and detailed numerous circumstances *Randolph* did not address, many of which are present here.  There was no settled law that clearly prohibited Appellees' conduct in the particular circumstances before them, and certainly not with the requisite specificity necessary in the context of a Fourth Amendment claim.

Eight years after *Randolph* was decided, the Supreme Court revisited the decision in *Fernandez v. California*, a case involving an abused female occupant who consented to a search of her shared apartment after the co-occupant, her male partner, had been arrested and removed from the apartment.  571 U.S. at 294.  In *Fernandez*, officers had been called to the apartment in connection with an earlier robbery and assault.  *Id.* at 295.  As officers approached the building, they heard sounds of screaming and fighting.  *Id.*  Once backup arrived, the officers knocked on the door of the apartment the sounds had come from.  *Id.*  A female who appeared to be crying answered the door holding a baby.  *Id.*  Her face was red, she had a large bump on her nose, and she informed the officers she had been in a fight.  *Id.*  She reported that her 4-year-old son was the only other person in the apartment.  *Id.*  One of the officers then asked her to step out so he could perform a protective sweep.  *Id.*  At that point, the co-occupant male came to the doorway and said, "You don't have any right to come in here.  I know my rights."  *Id.*  The

officers suspected the male occupant had assaulted the female occupant, so they removed him from the apartment, placed him under arrest and then transported him to the police station for booking. *Id.* One of the officers subsequently returned to the apartment, sought and obtained the female occupant's consent to search the apartment, where the officer found evidence of criminal activity. *Id.*

The *Fernandez* Court concluded that the officers had not violated the male occupant's Fourth Amendment rights.  In doing so, the Court opened by explaining that "our cases *firmly establish* that police officers may search jointly occupied premises if one of the occupants consents."  The Court went on to explain that *Randolph* had recognized only a "narrow exception" to that general rule. *Id.* at 294 (emphasis added).

The *Fernandez* Court rejected the petitioner's argument that law enforcement lacked consent to search the apartment because the male occupant had a continuing objection based on his earlier statement to stay out, by highlighting circumstances that distinguished it from *Randolph*.  The Court emphasized that the male occupant was not "standing at the door" objecting to the search at the time law enforcement entered, a distinction which the Court determined to be critical. *Id.* at 303-04.  The Court pointed out "a plethora of practical problems" that could arise in applying the "formalis[tic] rule" adopted in *Randolph* if an objector was not required to be standing at the doorway at the time law enforcement were going to enter. *Id.* at

19

304. One problem the Court noted was the difficulty in determining the duration of an objection. *Id.* at 304-05. In addressing that problem, the Court explicitly declined to treat an objection as lasting a "reasonable" period of time. *Id.* at 305. The Court also explained the difficulty in determining the proper procedure to register a continuing objection, including whether it would be necessary for the objecting occupant to reassert the objection when the officers were at the door. *Id.* The Court specifically questioned whether the petitioner's continuing objection argument would allow a husband who suspected that his wife would be willing to allow the police into their shared residence to register an objection in advance. *Id.* at 305-06. In addition, the Court pointed out the difficulty of determining which particular law enforcement officers would be bound by the objection, including whether it would apply only to the officer or officers present when the objection was made or if it could extend to other officers, such as those who were also involved in the investigation. *Id.* at 306.

The *Fernandez* Court concluded that the foregoing issues could all be eliminated if *Randolph* was "taken at its word" and construed to apply "only when the objector is standing in the door saying 'stay out' when officers propose to make a consent search[.]" *Id.* *Fernandez* demonstrates that the circumstances of Appellant's claimed objection to the Deputies' entry into the Home are not addressed, let alone clearly established, in *Randolph*. It is undisputed that Deputy

Nichols had a brief telephone discussion with Appellant before Deputy Nichols arrived at the Home. (Aplt.App.-2-0066-0067, ¶¶ 14, 15.) Although it is undisputed that Deputy Nichols did not inquire about entering the Home during that telephone call (*id.* ¶ 15), Appellant claims in this lawsuit that he peremptorily told Deputy Nichols that Deputy Nichols could not come into the Home (*id.* ¶ 16), apparently attempting to "register an objection in advance" because he "suspect[ed] that his estranged [wife] might invite the police" into the Home. *See Fernandez*, 571 U.S. at 305.

It is undisputed that Deputy Nichols is the only one of the Deputies that participated in the call (Aplt.App.-2-0066-0067, ¶ 14), yet Appellant also seeks to impute his claimed objection to Deputy Bozarth. *Cf. Fernandez*, 571 U.S. at 305-06 ("Finally, there is the question of the particular law enforcement officers who would be bound by an objection. Would this set include just the officers who were present when the objection was made? Would it also apply to other officers working on the same investigation?"). It is undisputed that Appellant was not standing in the doorway telling the Deputies to stay out—either when the Deputies entered the garage or when they entered the door leading from the garage into the main part of the Home (Aplt.App.-2-0070-0071, ¶¶ 28, 30). *Cf. Fernandez*, 571 U.S. at 303-04 ("It seems obvious that the calculus of this hypothetical caller [underlying the decision in *Randolph*] would likely be quite different if the objecting tenant was not

standing at the door.").   Finally, it is also undisputed that Appellant did not reassert any claimed objection by stating to the Deputies that they needed to stay out or leave when he did encounter them in the Home.  *Cf. Fernandez*, 571 U.S. at 305-06 ("Another problem concerns the procedure needed to register a continuing objection.   Would it be necessary for an occupant to object while police officers are at the door?").

In *Fernandez*, the Supreme Court expressly concluded that *Randolph* did <u>not</u> address any of the foregoing factual circumstances.   Thus, *Randolph* does not clearly establish that either Deputy Nichols or Deputy Bozarth violated Appellant's Fourth Amendment rights by entering the Home.  *See Starrett v. City of Lander*, 699 F.App'x 805, 807 (10th Cir. 2017) ("Recognition that a 'case presents a unique set of facts and circumstances' is an 'important indication' that the conduct at issue 'did not violate a clearly established right.'") (quoting *White v. Pauly*, 137 S.Ct. 548, 552 (2017)).   Accordingly, Deputies Nichols and Bozarth are entitled to qualified immunity on the First Claim for Relief in Appellant's Complaint.

    B.  Defendants' level of force used to handcuff and transport Appellant did not violate clearly established law.

    1.  <u>None of the Defendants' individual or collective actions violated clearly established law while securing Appellant in custody.</u>

Allegations of excessive force used in the context of the seizure of a free

citizen implicate the Fourth Amendment's protection against unreasonable seizures.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  "Determining whether the force used to affect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  *Id.* at 396.  "[T]he Fourth Amendment does not require police to use the least intrusive means in the course of a detention, only reasonable ones."  *Hawker v. Sandy City Corp.*, 591 F.App'x 669, 674 (10th Cir. 2014).  Indeed, the right to make an arrest necessarily carries with it the right to use some degree of physical coercion to effect it.  <u>*Edwards v. City of Muskogee, Oklahoma*</u>, 841 Fed. Appx. 79, 83 (10th Cir. 2021)(unpublished), <u>cert. denied sub nom.</u> <u>*Edwards v. Harmon*</u>, 211 L. Ed. 2d 26 (Oct. 4, 2021) (quoting *Lundstrom v. Romero*, 616 F.3d 1108, 1126 (10th Cir. 2010)).

The Supreme Court has emphasized that "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are *entitled to qualified immunity* unless existing precedent 'squarely governs' the specific facts at issue."  *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (emphasis added).  Indeed, the Court very recently reiterated that in all but obvious cases, a plaintiff must identify a case to put a defendant on notice that his or her conduct is unlawful.  *See Rivas-Villegas v. Cortesluna*, No. 20-1539,

2021WL4822662, at *2-3 (U.S. Oct. 18, 2021) (reversing the lower court's denial of qualified immunity and finding the facts of the case at bar were not sufficiently similar to the precedent relied on by the lower court or any decisions of the Supreme Court to preclude qualified immunity); *see also City of Tahlequah, OK v. Bond*, No. 20-1668, 2021WL4822664, at *2 (U.S. Oct. 18. 2021) ("Neither the panel majority nor the respondent has identified a single precedent finding a Fourth Amendment violation under similar circumstances.  The officers were thus entitled to qualified immunity.").

There is no clearly established law which would have put Appellees on notice that the actions each took in taking Appellant into custody and securing Appellant in handcuffs for his reported act of domestic violence were constitutional violations.  Prior to being secured in custody, the physical altercation between Appellant and Appellees lasted little more than thirty seconds.  (Aplt.App.-2-0075, ⁋ 45.)  Upon making entry, the Deputies clearly announced their presence and each of the three Deputies verbally provided instructions to Appellant, with which he largely did not comply.  (Aplt.App.-2-0073-0075, ⁋⁋ 36, 41, 42, 43.)  The exception was when Appellant initially came down the stairs (*id.* ⁋ 39); however, Appellant then attempted to flee up the stairs when Deputy Nichols reached for him and continued to physically attempt to escape from the Deputies up the stairs despite orders to stop resisting (Aplt.App.-2-0073-0075, ⁋⁋ 40, 41, 42, 43).  The physical

interaction following Appellant's flight up the stairs was of limited duration and involved only hands on force.  None of the actions taken by Appellees violated clearly established law on the reasonable use of force, thereby entitling each to qualified immunity and summary judgment in each's favor.  *See*, *e.g.*, *Starrett*, 699 F.App'x at 806-07, 812 (affirming district court's grant of qualified immunity to officers accused of excessive force where officers allegedly threw the Appellant to the ground and arrested her for interference after Appellant shut the front door of her residence and refused to allow the officers inside without a warrant when the officers responded to domestic disturbance call at the home).

     a.    *Deputy Nichols did not violate clearly established law with the level of force he employed securing Appellant into custody.*

Upon entering the Home, Deputy Nichols called out for Appellant to come down and talk with them and, once he located Appellant on the stairs, gave continued directions for Appellant to come down the stairs.  (Aplt.App.-2-0071-0072, ¶¶ 29, 32, 36.)  Deputy Nichols also informed Appellant they had permission from his wife to be in the Home.  (*Id.* ¶ 37.)  Deputy Nichols placed hands on Appellant after he jerked away from him and retreated up the stairs, after having initially appeared to comply with orders to come down the stairs.  (*Id.* ¶¶ 39, 40.)  Deputy Nichols followed Appellant's movement, and Appellant landed down on the stairs while trying to flee.  (*Id.* ¶ 41.)  Once Sergeant Wunderlich had Appellant restrained,

Deputy Nichols put Appellant's hands behind his back to put handcuffs on him. (*Id.* ¶¶ 47.) Under these facts, Deputy Nichols employed the reasonable level of force the situation required to secure Appellant, who had not complied with verbal orders beginning with the phone call in the park through physically fleeing from the Deputies up the stairs of the Home, into custody for the domestic violence incident between Appellant and his wife. Deputy Nichols is entitled to qualified immunity, and no clearly established law lends itself to a conclusion otherwise.

> b.  *Sergeant Wunderlich did not violate clearly established law with the level of force he employed securing Appellant into custody.*

Sergeant Wunderlich went hands on with Appellant as he was physically resisting Deputy Nichols and pulled away from Deputy Nichols, scrambling up the second flight of stairs. (Aplt.App.-2-0075, ¶ 44.) Sergeant Wunderlich secured Appellant on the stairs to restrain his movement and allow Deputy Nichols to be able to handcuff him. (*Id.* ¶¶ 44, 47.) For his involvement in the interaction, Sergeant Wunderlich employed the reasonable level of force the situation required to take Appellant, who was non-compliant with verbal orders and physically resisted arrest by fleeing up the stairs, into custody for a reported felony charge of domestic violence. (*Id.* ¶¶ 47, 55.) Sergeant Wunderlich is also entitled to qualified immunity in the absence of any clearly established law to the contrary.

c.    *Deputy Bozarth did not violate clearly established law with the level of force she employed securing Appellant into custody.*

Deputy Bozarth's physical contact with Appellant was extremely limited-- once before he was secured in handcuffs.  When Appellant fled up the stairs after Deputy Nichols reached for his arm, Deputy Bozarth grabbed for Appellant in an attempt to prevent him from going up the stairs.  (Aplt.App.-2-0074, ¶ 43.)  Deputy Bozarth's level of force was negligible and cannot form the basis for an excessive force claim against her.  Even so, her action was reasonable under the circumstances in attempting to bring a non-compliant arrestee into custody for reported domestic violence against his wife.  Deputy Bozarth is therefore entitled to qualified immunity given the absence of any authority holding otherwise.

2.    <u>The manner of Appellant's handcuffing did not rise to the level of a constitutional violation or violate clearly established law</u>.

Appellant's claim of Fourth Amendment excessive force as it relates to the alleged tightness of the handcuffs and the alleged prolonged period of being in handcuffs does not constitute a constitutional violation in the Tenth Circuit and fails for lack of clearly established law.  When an excessive force claim involves a challenge to the manner or course of handcuffing, a plaintiff is required to show that the force used was more than reasonably necessary and must show some non-de minimis actual injury.  *Donahue v. Wihongi*, 948 F.3d 1177, 1196 (10th Cir. 2020)

27

(citing *Fisher v. City of Las Cruces*, 584 F.3d 888, 897-98 (10th Cir. 2009)).   For unduly tight handcuffing to constitute excessive force and trigger liability, a plaintiff must show an actual injury, a causal link between that injury and the unduly tight handcuffs, and an officer's knowledge that the handcuffs were too tight.   *Zartner v. Miller*, 760 F.App'x 558, 560-61 (10th Cir. 2019).   "Failure to satisfy the 'non-de minimis-injury standard' is determinative of whether a plaintiff's excessive-force claim fails."   *Strassel v. Norris*, No. 17-cv-02297-CMA-NRN, 2020WL1812245, at *4 (D. Colo. April 9, 2020) (collecting Tenth Circuit cases demonstrating de minimis injuries).

Appellant's claims regarding bruised wrists and pain from the handcuffs are nearly identical to claims made by the Appellant in *Scott v. City of Albuquerque*:

> Scott testified that his wrists were 'bruised and swollen' for 'about a week' after the arrest, and that 'anything he did that involved moving his wrists hurt.'   He also alleged that the cuffs left 'redness, soreness and indentations' on his wrists.   Yet, he concedes that he never got any medical treatment for his injuries and that the injuries were gone after about a week.

711 F.App'x 871, 881 (citation to internal record omitted).   The *Scott* Court found that the Appellant's injuries were not enough to show a constitutional violation for excessive force stating that despite being in pain for hours while wearing the handcuffs, the pain did not last long, and no permanent injury was left because the swelling went down and bruises faded after about a week.   *Id.*

28

Although Appellant claims pain and bruising from the handcuffs, there is no material evidence in the record that these injuries were anything beyond de minimis. (*See* Aplt.App.02-0077, ⁋ 54); *see also Salazar v. City of Boulder, CO*, No. 20-cv-01497-KLM, 2021WL3286598, at *13 (D. Colo. Aug. 2, 2021) ("[Plaintiff] now claims bruising of her wrists as well as a dislocated shoulder and shoulder injury, but the only evidence supporting this is her Declaration …. [Plaintiff's] Declaration, however, contains self-serving, conclusory statements, unsupported by any documents, medical records, or other admissible evidence to create a material issue of disputed fact.").

Furthermore, to the extent Appellant believes he suffered emotional injury when he was walked to the patrol car in handcuffs, here too, there is no evidence in the record to establish any such injury rose to the level of a constitutional violation. In the context of arrest, alleged humiliation must be more harmful than that which accompanies the typical custodial arrest. *Scott*, 711 F.App'x at 882 ("[A] public arrest does not violate the Fourth Amendment simply because it is embarrassing."). As a matter of law, Appellant cannot establish a constitutional violation with respect to the manner of handcuffing during his arrest and as such Appellees were entitled to summary judgment on his Fourth Amendment claims based on the handcuffing.[6] Furthermore, the thrust of precedent in the Tenth Circuit

does not support a finding that Appellees violated clearly established law, indeed

precedent, such as *Scott*, unequivocally establishes that they did not.

## CONCLUSION

For the reasons set forth above, the District Court properly dismissed

Appellant's claims against Appellees with prejudice, and the District Court's

Dismissal Order and Final Judgment should be affirmed.

Respectfully submitted this 31st day of January, 2023.

OFFICE OF THE COUNTY ATTORNEY,
COUNTY OF DOUGLAS, COLORADO


s/ *Kelly Dunnaway*
Sean Kelly Dunnaway
Deputy County Attorney
100 Third Street
Castle Rock, CO    80104
Telephone:    303-660-7414
FAX:      303-484-0399
E-mail: kdunnawa@douglas.co.us

*Attorneys for Appellees Brian Wunderlich, Kevin Nicholson and Tammy Bozarth*

## TENTH CIRCUIT RULE 25.5 CERTIFICATION

Counsel for Appellees hereby certifies that, in conformity Tenth Circuit Rule 25.5 and the Tenth Circuit's CM/ECF User Manual, Section II, Policies and Procedures for Filing Via ECF, Part J, the foregoing Appellees' Corrected Response Brief complies with the privacy and redaction requirements of Fed. R. App. P. 25, as well as the applicable federal rules of civil procedure.

Dated:    January 31, 2023

s/*Kelly Dunnaway*
Sean Kelly Dunnaway
Deputy County Attorney
100 Third Street
Castle Rock, CO    80104
Telephone:    303-660-7414
FAX:      303-484-0399
E-mail:kdunnawa@douglas.co.us

*Attorneys for Appellees Brian Wunderlich, Kevin Nicholson and Tammy Bozarth*

## CERTIFICATE OF COMPLIANCE WITH
## APPLICABLE TYPE VOLUME LIMITS

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this corrected brief contains **7,161** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Local Rule 32.

This corrected brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated:    January 31, 2023

> ___*s/ Kelly Dunnaway*___
> Sean Kelly Dunnaway
> 100 Third Street
> Castle Rock, CO    80104
> Telephone:    303-660-7414
> FAX:      303-484-0399
> E-mail: kdunnawa@douglas.co.us
>
> *Attorneys for Appellees Brian Wunderlich, Kevin Nicholson and Tammy Bozarth*

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellees do not believe that oral argument would materially assist the Court

in the determination of this appeal.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 31st day of January, 2023, a true and correct copy of the foregoing **DEFENDANTS'-APPELLEES' CORRECTED RESPONSE BRIEF** was filed with the Court via *CM/ECF*, which will cause the foregoing to be served upon the following counsel of record:

David A. Lane
Michael P. Fairhust
Killmer, Lane & Newman, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
dlane@kln-law.com
mfairhurst@kln-law.com


          *s/ Patrick D. Fiedler*
          100 Third Street
          Castle Rock, CO    80104
          Telephone:    303-660-7414
          E-mail:    attorney@douglas.co.us